[Cite as *In re J.B.*, 2013-Ohio-1706.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**Nos. 98566 and 98567**

# IN RE: J.B.
# Minor Child

## [Appeal by A.C., Grandmother]

**JUDGMENT:**
AFFIRMED

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD 09901436 and AD 09901437

**BEFORE:** McCormack, J., Jones, P.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:** April 26, 2013

**ATTORNEY FOR APPELLANT**

Doron M. Kalir
Cleveland-Marshall College of Law
Civil Litigation Clinic
1801 Euclid Avenue, LB 138
Cleveland, OH 44115


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: Michelle A. Myers
Assistant County Prosecutor
C.C.D.C.F.S.
4261 Fulton Parkway
Cleveland, OH 44144


**GUARDIAN AD LITEM**

Michael B. Granito
24400 Highland Road
Suite 162
Richmond Hts., OH 44143

TIM McCORMACK, J.:

{¶1}   In this consolidated appeal, appellant, Angelique C. ("appellant"), appeals the judgments of the Cuyahoga County Court of Common Pleas, Juvenile Division, granting permanent custody of two of her granddaughters to the Cuyahoga County Department of Children and Family Services ("CCDCFS" or "the agency").

{¶2} We begin our decision with the recognition that the controlling analysis in a permanent custody matter, as dictated by the statute, is the best interest of the child. After a careful review of the record, we find clear and convincing evidence supports the trial court's determination that granting permanent custody to the agency is in the best interest of appellant's granddaughters.   Therefore, we affirm the trial court's decisions.

## Background

{¶3} In late 2008, appellant's two minor daughters gave birth several weeks apart. On October 9, 2008, appellant's 13-year-old daughter, S.B., gave birth to a girl.   Weeks later, on November 4, 2008, her 15-year-old daughter, R.B., also gave birth to a girl. Both babies have the same initials "J.B.," and we will refer to S.B.'s daughter as "Granddaughter-1" and R.B.'s daughter as "Granddaughter-2" where appropriate.

{¶4} An incident occurred on January 29, 2009, which caused the removal of both babies.  The incident occurred in another individual's residence, where S.B., R.B., and two men were present.   S.B. got into an argument with one of the men, and she showed a knife, causing the finger of one of the men to be cut.   One of the men reportedly pulled a

gun. During the incident, S.B.'s baby was sleeping in another room in the residence in a crib without a mattress. When a social worker went to the house, she found the residence to be in deplorable condition and infested with rats and roaches.

{¶5} Four days later, on February 2, 2009, CCDCFS took emergency custody of both babies; R.B.'s baby was less than three months old, and S.B.'s baby was less than four months old.

{¶6} In August 2009, seven months after the agency took temporary custody of the babies, both babies were placed in the same foster home and have remained there since that time.

### I. Substantive and Procedural History Regarding Granddaughter-1 (S.B.'s Daughter)

{¶7} Six months after the removal of S.B.'s child, on July 30, 2009, the trial court adjudicated the child as neglected and dependent and, on the same day, committed her to the temporary custody of CCDCFS. On May 21, 2010, CCDCFS was granted the first extension of temporary custody; on August 28, 2010, a second extension was granted.

{¶8} On January 28, 2011, 18 months after being granted the child's temporary custody, CCDCFS filed a motion to modify temporary custody. The agency sought permanent custody. Subsequently, both S.B. and her mother (appellant), filed a motion for legal custody. In addition, the guardian ad litem ("GAL") for the child filed a

motion for legal custody to be granted to Sanetta C. ("Great-grandmother Sanetta"), who is the child's maternal great-grandmother and appellant's mother.

### The Trial for Permanent Custody for Granddaughter-1

{¶9} The trial for permanent custody for Granddaughter-1 took place on November 17, 2011, January 24, 2012, and March 21, 2012. CCDCFS presented the testimony of Officer Omar Maxel; two social workers in this case, Sarah Narine and Justin Fraley; and the foster mother.

{¶10} S.B. presented the testimony of Tamela Row (a Murtis Taylor case worker), Krsanandini Devi-Dasi (co-director of Dasi-Ziyad Family Institute), Vanessa Davis (a teacher at Beech Brook), and B.W. (S.B.'s cousin).

{¶11} Appellant, Great-grandmother Sanetta, and S.B. herself testified as well.

### A. Officer Maxel's Testimony

{¶12} At trial, Officer Maxel testified about an incident in which S.B. was involved a month before the first day of the trial. On October 7, 2011, he responded to a call about fighting in a shopping center. S.B. had gone to a store with her three-year-old stepsister, whom she was babysitting. The officer learned from the store employees and three victims that S.B. instigated a fight with one of the victims, a 12-year-old, in the parking lot. During the incident, S.B. left the three-year-old unattended in the store.

{¶13} When Officer Maxel and his partner arrested S.B. for the incident and attempted to put her in the backseat of the police cruiser, she began to yell and scream,

and she fought with them.  Officer Maxel testified that it took three officers to place S.B. in the backseat.  When the three victims stood outside the cruiser to identify her, she became angry and started to kick at the bars on the cruiser's windows, all the while screaming and yelling.  In the police station, as soon as she was uncuffed, S.B. began to fight with the officers again.  It took four officers to subdue her.  She was charged in juvenile court with endangering children, for leaving the three-year-old child unattended; criminal damaging, for throwing a rock through one of the victims' car window; resisting arrest, for fighting with the officers; and assault, for hurting the 12-year-old girl during the fight.  Officer Maxel testified that during the time when S.B. was in custody, she did not inquire as to the welfare of the three-year-old.

## B. Two Social Workers' Testimony

{¶14} Social worker Sarah Narine testified that she began working with S.B. in March 2008 to address her delinquent behaviors.  This was seven months before she gave birth.  After S.B. gave birth in October of that year, Narine then worked with her on her parenting skills.  S.B. named a father, but subsequent genetic testing showed the individual was not the father.

{¶15} Narine testified that a month after the baby's birth, S.B. got into an argument over some candy with her father, with whom she lived at the time.  She left the house, leaving the baby unattended.

{¶16} Subsequently, an incident occurred on January 29, 2009, which caused the removal of S.B.'s child. In this incident, she was involved in a fight with the alleged father of her child and the man's brother, in a house known as a "flop" house. During the incident, her child was sleeping in a mattress-less crib in another room in the house.

{¶17} This incident, coupled with the agency's concerns about S.B.'s inability to care for her child and S.B.'s family's inability to control S.B.'s behaviors, caused the agency to remove the child.

{¶18} A case plan to achieve reunification was put in place the next month. The reunification plan included counseling to address S.B.'s anger management, emotional stability, schooling, and parenting skills.

{¶19} Narine testified that before J.B. was born, S.B. did not attend school regularly. She would run away from home for up to a week at a time. After the birth of the baby, she stopped attending school. She was subsequently enrolled in three different schools for young parents. She did not complete any of the schooling.

{¶20} The agency referred S.B. to several programs to help with her parenting skills and to provide her with a crib and other baby supplies. One of the programs, Community Collaborative, tried to stay involved in S.B.'s case. They tried to engage S.B. and her mother (appellant). S.B. and her mother were not responsive to their offer to help, however.

**{¶21}** S.B. was also referred to "MST" in-home counseling services by the juvenile court when she was involved in a delinquency case. The counseling was implemented to address her emotional stability, domestic violence, fighting, and aggression issues. Because S.B. went back and forth between her mother's and her father's residences, the counselor was not always able to locate her. As a result, Applewood, the agency responsible for providing the counseling services, changed it to on-site services. However, Applewood had a difficult time engaging S.B. According to Narine, appellant encouraged S.B. not to attend the counseling appointments. Appellant claimed S.B. did not need counseling. CCDCFS then referred S.B. to Bellflower, which provides mentoring services. S.B. was discharged from the program due to her angry outbursts. S.B. was then enrolled in a program at Murtis Taylor, a local community center. Her attendance there was not consistent either. Appellant, on her own, found a two-month program at the Dasi-Ziyad Family Institute and enrolled S.B., but it took S.B. six months to complete the program.

**{¶22}** CCDCFS helped S.B.'s enrollment in an additional parenting program at Beech Brook, another local community and counseling center. S.B. attended the program sporadically. Narine felt appellant did not help S.B. implement the techniques she was taught there.

**{¶23}** Narine testified that the objectives set forth in S.B.'s case plan had not been met.

**{¶24}** Regarding visitations, they were held weekly at the agency for two hours each. S.B.'s family members were included in these visits.

**{¶25}** Beginning in June 2010, S.B. was making some progress. She attended school and most of her appointments. As a result, CCDCFS started in-home overnight visits. However, the agency terminated them after appellant informed the agency that S.B. stopped attending school and counseling services. S.B. was not staying in the home or following the rules. When Narine asked appellant if she herself was able to provide for S.B.'s child during the child's in-home visits, appellant told her "it was overwhelming for her. She had other children in the home to care for. She had other things to do for herself." As a result, the visits went back to being held at the agency.

**{¶26}** Several months later, in August 2010, S.B. indicated to Narine that she was "willing to be committed" to her child. Other family members also came forward to offer to help S.B. As a result, CCDCFS started overnight in-home visits again. These in-home visits ended at the end of the year, when the agency learned S.B. again showed poor decision-making and parental skills. One night, the child was not asleep, so S.B. took her outside at 2:00 a.m. and put her on the hood of the car. There was no adult supervision when the incident occurred.

**{¶27}** Regarding S.B.'s behavior, appellant told the social worker that "it was going to be very difficult, but there was nothing they could do about that. They would have to try to make it work."

**{¶28}** Narine acknowledged that S.B. and her child have a close relationship. She had observed S.B. show affection toward J.B. during the visits. However, Narine testified that the problems that led to the child's removal from S.B. had not been resolved. S.B. was still involved in fighting incidents and still had issues of anger and aggression. Her emotional stability, decision-making, and parenting skills were all causes for concern.

**{¶29}** The agency considered appellant as a potential relative placement. According to Narine, though, appellant indicated to the agency that she has other children and she was not at a point where she could take on another child. She said she was overwhelmed. Appellant attended between 20 to 30 percent of the visits. Although none of appellant's own children were removed, Narine testified that there had been ten referrals to the agency due to reports of appellant's neglect of her own children. In addition, the agency learned that appellant's boyfriend, who is also the father of her youngest child, had charges against him relating to sex abuse of minors and cruelty towards children. Separate charges were identified in Cuyahoga County and in Georgia. When asked about it, appellant told the agency she was no longer with her boyfriend. The agency was unable to verify that information.

**{¶30}** Narine testified that the agency also considered Great-grandmother Sanetta as a potential placement. The agency found her to be unsuitable. When the agency investigated her background, it learned she was convicted of gross sexual imposition in

1982 and served five years in prison for the offense. Narine acknowledged that, in 1992, Sanetta received the custody of two children of family members from Cuyahoga County Juvenile Court. In 1997, she received custody of additional children of family members from the juvenile court. Narine also acknowledged that an in-home visit at Sanetta's house, in which Narine observed Sanetta's care, was appropriate.

{¶31} CCDCFS was also concerned with great-grandmother's physical and mental health issues. She had ongoing medical treatment for a pulmonary disease. She also received mental health counseling. Moreover, she only had Social Security income and was unable to work.

{¶32} Seven months after being removed, S.B.'s child, ten months old, was placed in her current foster home, together with her cousin. She has remained there since. Narine testified that S.B.'s child is very close to both her foster mother and foster father. When she was ill or agitated, she would seek out their comfort and would respond to their guidance. The child had significant medical issues. She had difficulties eating when she was younger. The condition required her to have tongue surgery. As she got older, she also needed to have eustachian tubes put into her ears to deal with drainage problems.

{¶33} Justin Fraley, the second social worker, was on the case since September 2011 and testified that S.B. needed directions and help from other family members to attend to her child's needs during the visits. However, she was affectionate with her child. She would hug and kiss her when she came into the visitation room, and she

would carry her out and put her in the car seat when the visitation was over. She would tell her child she loved her.

**{¶34}** Fraley also testified about the October 7, 2011 incident. That incident was where S.B. left a younger sibling, who was in her care, alone in the store as she went to the parking lot to engage in a physical fight. The incident resulted in pending delinquency charges against S.B.

**{¶35}** Fraley stated that S.B. went to Murtis Taylor for counseling to address depression and anger issues. Her attendance was sporadic initially, but she started to open up to her counselor recently. She had on occasions expressed to Fraley her feelings of being overwhelmed.

**{¶36}** Fraley testified that S.B. had originally resided with appellant but then moved in with her father, with whom she was staying at the time of the trial (January 24, 2012). Appellant told Fraley that S.B. went to live with S.B.'s father because appellant "can't deal with it."

**{¶37}** Fraley testified that appellant attributed S.B.'s behavior problems to the loss of her child. Appellant attended most of the visits while Fraley was on the case, and she consistently expressed the wish that her granddaughters should be returned to the family. However, appellant also told Fraley she was overwhelmed. As to Great-grandmother Sanetta, her attendance was consistent, and she appeared to have a genuine interest in her great-granddaughters.

## C. Foster Parents' Testimony

**{¶38}** The foster mother testified that she and her husband had received extensive training prior to becoming foster parents. She, in fact, works for a foster care agency and has a good understanding of the different goals for the children placed in the foster homes. When S.B.'s child was placed in her home, the agency goal was a six-month reunification. To facilitate that goal, she worked closely with S.B. and her family, and she included S.B. in many activities beyond the supervised visits. The foster mother stated she and S.B. had a very open relationship and they engaged in various activities together.

**{¶39}** The foster mother testified that S.B.'s child had many medical needs when she first came into their family. She had a tic seizure disorder, and she was diagnosed with hydrocephalus initially. In addition, she was not able to eat regular food at ten months due to an enlarged tongue, and surgery was performed to clip her tongue. She also required the insertion of tubes in her ears due to frequent ear infections. Because of these health issues, she needed speech therapy. S.B. was required by her case plan to attend these medical appointments. At the beginning, when the foster mother took the child to the medical appointments, she would pick up S.B. to go with her. However, after the foster mother stopped providing transportation, S.B. eventually stopped showing up.

{¶40} Regarding the in-home visits, the foster mother testified that immediately after one home visit, the child had a fever. She and her husband took her to the emergency room, where she was diagnosed with hand, foot, and mouth disease. After another home visit, the child returned with a severe diaper rash, which required a visit to the emergency room. In addition, according to the foster mother, after every home visit, the child would return with diarrhea.

{¶41} During a round of home visits beginning in August 2010, the child would come back to the foster family with dirty feet, and she was malodorous of diarrhea and cigarette smoke. From November 2010 to January 2011, the child would come home with bug bites, which required a visit to the emergency room on two occasions.

{¶42} The foster mother testified that if permanent custody were to be granted to CCDCFS, she wanted to adopt S.B.'s child, having signed an Intent to Adopt form. She described the child as follows:

> [J.B.] is a joy to have in our home. She is a fabulous child. She brings so much joy. That's the best way I can describe it. She's a happy child. We interact with her. We do a lot of family activities together. She is enrolled in things in the community, and we love having [J.B.] in our home. She's so inquisitive and we spend a lot of time doing things together, hiking and hay rides. * * * [J.B.] is very bonded to both myself and my husband and to her cousin who is also placed into our home.

## D. Testimony Presented On Behalf of S.B.

**{¶43}** Tamela Rowe, a Murtis Taylor case worker, testified for S.B. She testified about the counseling services provided to S.B. and about S.B.'s improvement in dealing with her tendency to fight with others and her other emotional issues.

**{¶44}** Krsanandini Devi-Dasi, co-director of the Dasi-Ziyad Family Institute, also testified for S.B. S.B. was a student in her parenting class at DePaul's Family Center in February 2009. Later, S.B.'s mother (appellant) asked Ms. Devi-Dasi to provide additional parenting education to S.B. Appellant believed her daughter needed to know more about being a good mother. S.B. completed a 16-hour parenting course in October 2009. Ms. Devi-Dasi described S.B. as enthusiastic and interested in parenting skills. She stated S.B. could be a good mother; however, she did not have any further contact with S.B. since 2009.

**{¶45}** Vanessa Davis, a parent education teacher at Beech Brook, testified that she taught the nine-week Teen Mom Program, which S.B. attended and completed. She stated that S.B. participated in role-playing and appeared to retain the information that was taught.

**{¶46}** B.W., S.B.'s cousin, testified that she contacted Sarah Narine to let her know she was interested in having both S.B.'s and R.B.'s children placed with her.

## E. S.B.'s Testimony

**{¶47}** S.B. testified on her own behalf. She was in the juvenile detention center when she found out she was pregnant. After she was released from the detention center, she resided with her father. She attended counseling at Applewood pursuant to a court order. She continued the counseling at Murtis Taylor.

**{¶48}** Regarding the October 2011 incident about which Officer Maxel testified, S.B. stated she was found delinquent of aggravated menacing and disorderly conduct because of her conduct in the incident. She also admitted she was found delinquent in a separate theft matter.

**{¶49}** She testified that she has lived with her mother since February 2012, and she planned to stay with her until she could move out on her own.

**{¶50}** As to the diaper rash the foster mother described, S.B. stated she was not aware that her child had diaper rash. She stated that she had taken her child to the doctor on one occasion to examine a rash on the child's body and was told she had been bitten by bedbugs.

**{¶51}** S.B. testified that she was shattered after the agency removed her baby following the January 29, 2009 incident. She stated that her child is everything to her and she has been making an effort to be reunified with her. S.B. stated that if her child were returned to her care, she would get a job and take education seriously. She said she

would want to be a role model for her child. She testified that she has a bond with her child and her child would whisper to her, "Mommy, I want to come home, too."

{¶52} S.B. stated that she and the foster mother initially had a good relationship, but the relationship went sour when the foster parents indicated their desire to adopt her child and her child's cousin. S.B. also testified that she read articles on the internet, which suggested that the Children and Family Services employees would receive additional compensation whenever the agency is granted permanent custody. She felt the social workers may have had ulterior motives in this case. She did not believe the goal in this case was ever reunification.

### F. Appellant's Testimony

{¶53} Appellant testified that she had resided in her current 4-bedroom residence for four years. She has four daughters (age 17, 12, 9, and 4) currently living at home, including S.B. She receives child support and worked odd jobs to support herself and her family. She testified that she could adequately provide for the addition of her granddaughter.

{¶54} Appellant denied telling the social workers she was overwhelmed, alleging the social workers on this case lied, "played games" with the family, and were manipulative. She denied having felt overwhelmed and stated that she always had cared for and had control over her children.

**{¶55}** Appellant, however, acknowledged that the agency first got involved with S.B. because of S.B.'s delinquent behaviors — staying out, not coming home, getting suspended from school, and getting in fights. Appellant admitted she could not control S.B.'s behaviors.

**{¶56}** Appellant nonetheless testified that she believed S.B. is emotionally stable but will continue to feel hurt until her child is returned to her. Appellant stated that S.B.'s healing process would begin only when she knows her baby is safe and she could wake up talking to her baby. She also testified that S.B. would see scratches on her child's forehead and bruises under her eye in the visits, and she would feel upset and helpless because she couldn't do anything about it.

**{¶57}** Appellant stated that S.B. was a very good mother and that she was proud of S.B. When asked about the recent delinquency charges against S.B. despite the progress she believed S.B. had made, appellant responded that the fact that a person was charged did not necessarily mean she was guilty.

**{¶58}** Appellant explained that she was not always at the visits because the children's own mothers — her daughters — were there, in addition to her own mother, Sanetta, and also because "it's too much when we get ready to leave and this baby is crying for her mother. It's like she's scared to even go back."

### G. Great-grandmother Sanetta's Testimony

{¶59} Great-grandmother Sanetta testified that she moved back from Texas after her great-granddaughters were removed. She contacted CCDCFS to express her interest in taking custody of the children. After a background check, she was advised she could not get custody because of a fourth-degree gross sexual imposition conviction in 1982. However, she was able to obtain custody of two young family members, ages one year old and two months old, in the early 90's, and she received custody of two more family members in the mid 90's.

{¶60} Great-grandmother Sanetta attended every visit, and she would bring food and goodie-bags for her great-granddaughters, as well as for S.B. She testified that the children looked forward to seeing her, and Fraley, who had visited her two-bedroom apartment, deemed it appropriate. She stated she had enough space for her great-granddaughter and would provide good care if she were placed with her. She relied on Social Security disability income for her financial support.

{¶61} She testified that S.B. may be mature enough, but she did not have the means to take on the parental responsibility.

## H. GAL's Report and Testimony

{¶62} The GAL prepared a report prior to the permanent custody trial. In his report, he noted S.B. initially showed a willingness to work the case plan, but CCDCFS filed the motion for permanent custody when she began to show a lack of commitment. The GAL also noted the recent delinquency charges, which he felt raised questions

concerning the safety of the child if the child were returned to S.B. He expressed his disappointment with S.B.'s lack of concern as to how her behavior will affect the custody matter. The GAL recommended that legal custody be granted to Great-grandmother Sanetta, because she has demonstrated her concern about the welfare of her granddaughter and indicated her willingness to raise her.

{¶63} At trial, the GAL reiterated his recommendation, but he acknowledged he had not observed S.B.'s child in her foster family for "a while," the last observation being "some time ago."

{¶64} On June 4, 2012, the trial court issued a decision committing S.B.'s child to the permanent custody of CCDCFS.

## II. Granddaughter-2 (R.B.'s daughter)

{¶65} On June 16, 2009, the trial court found Granddaughter-2 (R.B.'s daughter) to be neglected and dependent. On September 13, 2009, the trial court committed her to the temporary custody of the agency. Subsequently, Great-grandmother Sanetta filed a pro se motion for legal custody of Granddaughter-2.

{¶66} On November 24, 2009, the agency filed a motion for an extension of temporary custody. On January 4, 2010, the trial court granted the extension. On June 7, 2010, the court reviewed the matter and determined R.B. was still in need of case plan services.

**{¶67}** On July 20, 2010, CCDCFS filed a motion for permanent custody. Appellant also filed a motion for legal custody.

**{¶68}** On September 8, 2010, the trial court reviewed the matter again and determined that although R.B. was engaged in services, progress had not been made. The court ordered the case plan to include Great-grandmother Sanetta and appellant.

**{¶69}** On September 23, 2010, J.B.'s foster parents moved to intervene in the case; the trial court denied the motion. This court affirmed the trial court's decision. *In re J.B.*, 8th Dist. No. 96652, 2011-Ohio-4830.

**{¶70}** On December 14, 2010, R.B. filed for legal custody of her child.

**{¶71}** In February 2012, the matter proceeded to trial on CCDCFS's permanent custody motion. The agency presented the testimony of two social workers and the child's foster parents.

## A. The Social Workers' Testimony at the Trial

**{¶72}** The social workers, Sarah Narine and Justin Fraley, testified at length at the trial. Narine worked on this case for over two and one-half years, from January 2009 to September 2011. Fraley took over the case after September 2011.

**{¶73}** Narine testified that the agency created a case plan for R.B. The plan included education, counseling for her emotional stability, domestic violence, and parenting education. The agency's goal was reunification of R.B. and her child. When R.B. reached 18 years of age, the agency added a housing component to the case plan.

## 1. R.B.'s Schooling and Emotional Stability

**{¶74}** R.B., 20 years old at the time of the permanent custody hearing, did not attend school regularly. She attended six different schools during the agency's involvement. She did not obtain a high school diploma or its equivalent.

**{¶75}** Regarding R.B.'s emotional stability, she was diagnosed with depression in the same year her child was born. She had problems controlling her anger. She would state she was stressed, and she had some outbursts. Narine testified that R.B.'s emotional stability was always a concern for the agency.

**{¶76}** As part of her case plan, the agency referred R.B. for counseling for mental health stability and for dealing with her aggressive behavior in the community. She was resistant to counseling services in the first year, but she was eventually linked with a counselor in a local program to address those emotional issues. Her attendance was not consistent. Despite the counseling services provided to her to control her anger, she was still involved in fighting incidents. Because of her inconsistent participation in the counseling services, the agency felt she had not achieved emotional stability. When her second child was born in April 2011, she reported feeling very overwhelmed.

**{¶77}** Because R.B. was not consistent with her attendance or participation, the agency concluded that she did not meet the objectives of this part of her case plan.

## 2. Parenting Classes

**{¶78}** Regarding the parenting component part of the case plan, R.B. made more efforts. She was initially referred to DePaul School for Young Parents, which included school and parenting classes. She completed the parenting class there. R.B. also participated in a parenting class at the Dasi-Ziyad Family Institute, but, according to Narine's testimony, she took "a very long time" to complete the 16 weeks of programming. R.B. also reported to Narine that she was participating in the Beech Brook parenting program. She did not complete the Beech Brook program. R.B. did complete a "TAPS" parenting program, which she sought out herself.

### 3. Visits

**{¶79}** The visits took place weekly in an agency setting for two hours each. They were supervised. R.B. came to the visits regularly but was often very late. When her child was an infant, R.B. would hold her, feed her, change her, and was attentive to her needs. As the child got older, R.B. would play with her and engage her. The child, however, had difficulties adjusting at the beginning of the visits. She would cry a lot and would try to leave. When she started speaking, she would say "I want to go home." After 15 or 20 minutes, she would then settle and interact with R.B. and the other family members. The agency worked with R.B. on easing these difficulties during the visits. Despite R.B.'s participation in the parenting classes, Narine found that during the visits with her child, R.B. "wasn't engaging and she wasn't bonding or involved with her child as much."

**{¶80}** Narine also observed R.B. talking and texting on her phone during some of the visits, which prompted the social worker's request that she take an additional parenting course.

**{¶81}** The second social worker on the case since September 2011, Fraley, described how J.B. acted when he picked her up for the visits:

> Crying [the] whole time and wanting to go back. I would ask her specifically, you know, [J.B.], you are going to see mommy. No, no, no, I don't want to. I don't want to. She would cry until we got off of 490 at about 55th. So from Solon all the way she would cry and she would calm down eventually once the visit got going.

Once she got there, she interacted well with the family members.

**{¶82}** The agency started weekly in-home visits on December 17, 2011. R.B. was required to be present at pick-up and drop-off at a neutral location. The site was an RTA station. The foster father was responsible for transporting the child to the RTA station for these in-home visits. He would drop the child off, but she would cling to him, not wanting to go. On the way back, she would appear "upbeat."

**{¶83}** At the fourth in-home visit, without informing the agency, R.B. changed the location of the visit to appellant's home, a violation of the case plan. R.B. falsely told Fraley that there was a gas leak in their apartment. While at appellant's home, J.B.

"didn't appear to be herself. * * * She was very quiet, very withdrawn, [and] she had very minimal interaction. * * * I [Fraley] observed her to be behaving differently."

{¶84} Because of the uncertainty of her housing situation, the agency amended the case plan to allow the in-home visit to take place in Great-grandmother Sanetta's house.

{¶85} On the day of Christmas Eve, an in-home visit was missed when R.B. called the foster father to tell him a family member would be picking up her child from the neutral location (an RTA station) instead. The foster father was informed by Fraley that this was not permitted. No explanation was given as to why R.B. could not come to the RTA station to pick up the child herself.

### 4. R.B.'s Second Child

{¶86} R.B. gave birth to another child, a boy, in April 2011. The agency initially took custody of the child, but the trial court returned custody to R.B. a short time after removal. R.B. continued to parent her son without agency involvement. Narine visited R.B. and her new baby in R.B.'s home. She had a crib for him, but Narine had to remind her to remove objects from the crib that may be harmful to him.

{¶87} R.B. told Narine that she was overwhelmed, although Narine observed R.B.'s care of her son to be appropriate. Narine believed that adding her daughter into her life would have overwhelmed her more. Moreover, her relationship with her son was different from her relationship with her daughter. She had cared for him for a much longer time than she had cared for her daughter. R.B.'s housing situation was not stable

in that she went back and forth between her own home and appellant's home, and sometimes R.B.'s father's home. R.B. lacked appropriate housing for two children and needed a dependable support system.

{¶88} When Fraley was asked why the agency determined R.B. could take care of her second child but not her first child, he testified similarly to Narine, explaining that R.B. had her son the entire time, whereas the bond was not there with her first child. This, he said, was based on his observation of the child's kicking and screaming and saying she doesn't want to see her mom. The child's resistence did not change after several in-home visits.

## 5. Housing

{¶89} Regarding R.B.'s housing, when she turned 18 in 2010, she was on a lease for a CMHA two-bedroom home with an older sister. She was, however, back and forth between the CMHA home and appellant's home, because she did not feel comfortable staying at the CMHA home by herself at times. Although R.B. was on the lease of an apartment she shared with her older sister, she moved out at one point and was dishonest with the social worker about why she had moved out. At the time of trial, R.B. was no longer on the lease of the shared apartment. R.B.'s counsel, however, produced a letter indicating she had been assigned an apartment unit, pending completion of necessary paperwork.

## 6. R.B.'s Lack of Support and Encouragement from Family

**{¶90}** Narine described some degree of family support but believed the family support fell short for purposes of reunification. She believed they could have encouraged and monitored R.B. more and provided more emotional support. They should have shown her how to balance school and the social services and helped her with transportation to various services and programs. At the meetings with the agency to which she would travel on her own, the family members would remark that R.B.'s behaviors were "all on her own." R.B. had conveyed to Narine her wish that her family would be more supportive of her.

**{¶91}** Overall, Narine's testimony reflects that from the beginning, the agency's goal had been reunification with the family. R.B., though, failed to achieve stability, either emotionally or in her environment. This, despite some support from her family.

### 7. The Foster Parents

**{¶92}** Fraley testified that he observed R.B.'s child in her foster family home every week. She has structure in the home where she had daily naps and snacks. She seems comfortable and bonded with both foster parents equally. The foster family had a newborn at the time of the trial, and she called him her brother. Fraley also stated that R.B.'s child has a very close relationship with S.B.'s child.

**{¶93}** Fraley described the relationship between R.B. and her child as a "slight bond," while testifying to the child's attachment to her foster parents. The trial court asked if Fraley had ever spoken to the child regarding her placement. Fraley testified

that the child "consistently expresses that she wants to stay with [foster mother] * * *. When I ask her and try to encourage her about going to see her mother * * *[,] [s]he says, No, I want to go back to [foster mother's] house * * *."

### 8. Appellant

{¶94} The agency considered placement of R.B.'s child with appellant. The agency eventually disapproved it. Appellant herself had a lengthy history with the agency. She had an "open case" with the agency in 2005 or 2006. When the agency explored appellant's interest in having R.B.'s child placed with her, she indicated she was overwhelmed with her own children. In addition to R.B. and S.B., she has three younger children. It would be very difficult to provide and care for an additional child. According to Narine's testimony, even after appellant filed for legal custody in July 2010, she was still stating to the agency that she was overwhelmed, that "it's too much," that she has her kids to take care of, and that "she has her own life to live." There were inconsistent statements made by her at that time as to whether she was or was not overwhelmed. The agency was aware of one incident where one of her children was left in a store.

{¶95} As to appellant's visits with the two children, Narine testified the following:

There has been times where she [appellant] has gotten angry and if it was at me, then I will leave. But it's been in front of the girls and it scared them, that happened. There are times that she is appropriate. She will play with them, she will bring them snacks, but then there are those times that there is some inappropriate behaviors [with other family members present at the visits], yes.

**{¶96}** Appellant initially attended the visits consistently. Her attendance later became very inconsistent. She did cooperate with the agency and made efforts to get R.B. enrolled in the Life Skills Program. She also tried to get her to attend GED classes. In fact, appellant tried to enroll in school herself. She also cooperated with the agency and assisted in R.B.'s getting help to address her mental health issues.

**{¶97}** The agency also asked appellant, R.B.'s father, and Great-grandmother Sanetta to attend a parenting program, which they completed.

**{¶98}** Narine acknowledged that there was animosity from appellant toward Narine, and their relationship was strained after the agency filed for permanent custody.

**{¶99}** The agency also considered R.B.'s father for placement of the child. They subsequently denied it because he was not employed, lived with his own mother in a two-bedroom apartment, where another child also resided. He was not very involved with the case. He rarely attended meetings or visits. The agency was concerned with his ability to control R.B.'s decision-making regarding her child. The child knows appellant is her grandmother.

## B. Foster Parents' Testimony

{¶100} Both foster parents testified at trial. The foster mother testified that R.B.'s child was placed into her home in August 2009. The agency told her and her husband that the goal was reunification. Because J.B., by that time, had already been in the agency's custody for eight months, she was on a fast-track reunification. They were told the placement would be six months.

{¶101} Because the goal of the case was reunification, both foster parents worked with R.B. to pursue that goal of reunification. In 2010, they took it upon themselves to reach out to R.B. and her family. They tried to include R.B. in her child's life. They took R.B. and the child to the zoo and went to Chuck E. Cheese together for the child's second birthday party. The foster mother also took R.B. and the child to a clinic for a test to establish paternity. The foster parents invited R.B. to other activities, but she did not attend. Because appellant felt her granddaughters should meet with Great-grandmother Sanetta, the foster mother and appellant coordinated a visit with Sanetta. The foster mother took pictures of the family and mailed the pictures to them. R.B. did not attend this event, however. The foster mother and her husband also organized a Labor Day picnic for R.B.'s family. R.B. did not attend this event. She also invited R.B. to go to the Cleveland Public Library for a story time activity. R.B. did not attend this event either. According to the foster mother, R.B. did not seem interested in seeing her child. When the foster mother took the child for her regular dental and medical checkups, the agency would inform R.B. of these appointments and invite her to

participate. She did not attend them. Great-grandmother Sanetta tried to come to a dental appointment, but she got lost. To help the child know her biological family, the foster mother took many photographs of her family and posted them in her room.

{¶102} R.B. improved in 2011. The foster mother would see R.B. frequently at the supervised visits, but she typically arrived late.

{¶103} The foster mother described R.B.'s child as very smart and articulate. The child asked a lot of questions about the visits. When the visits progressed to in-home visits on Saturdays, she had to spend a lot of time with the child preparing her for the visits on Friday nights. The preparations were difficult because the child had many questions. She would say: "Can you come with me?"; "Why do I have to go?"; "Will you pick me up early?"; "Can you stay with me?"; "Can [foster father] come too?" She would also ask if her cousin had to go too. On Saturday morning, it would be chaos trying to get her out the door and into the car. J.B. would literally "flee from the scene" by running from the front door down the hallway to get away from them and refusing to put on her coats and shoes.

{¶104} The foster mother would talk to the child about these visits, trying to encourage her. The child would mention a few things she did in R.B.'s home, and would say "I don't want to go." After the in-home visits began, both foster mother and J.B.'s day care teacher noticed that J.B. started to chew her fingers. Also, she became very reluctant to go to the weekly supervised visits on Wednesday nights. During a trip to the

visitation, she said, "I want to jump out of the car right now," which worried the foster mother. She would be "verbally and physically upset, crying, screaming" when she was dropped off for the weekly visits.

**{¶105}** The foster mother stated that she has a great relationship with R.B.'s child and that the child is very bonded to both foster parents. The child is also bonded to the foster parents' extended family. The child calls the foster mother's mother-in-law "Nana" and her father-in-law "Pop." They watch the child and her cousin two days a week. The girls spent the night at their house when the foster mother had her baby. The girls are also very bonded with the foster mother's mother and her father and her 17-year-old sister. The foster mother's mother, whom J.B. called "Grammy," would come to their home to help out. She was a major help with raising J.B.

**{¶106}** The foster mother emphasized that the two cousins have been raised together almost their entire life in the foster family and they are "more than sisters" and "more than twins."

**{¶107}** The foster mother stated that she was informed around September 2010, that the reunification plan had come to a halt and that the agency was considering a filing of permanent custody. She and her husband then offered to take legal custody of the child as an alternative to permanent custody. She said that Great-grandmother Sanetta "gave her blessings."

**{¶108}** The foster father testified that when the agency added Saturday home visits in December 2011, the child would appear anxious the night before these visits, asking, "Who's dropping me off?, Who's picking me up?, Are you picking me up?" over and over again. On the morning of the visits, it would be very difficult to get her out of the house. During the trip to the drop-off location, a rapid transit station, she would "lock up" — stop talking to him. Once they got there, when R.B. arrived, the child would start acting out and crying, saying, "Do I have to go[?] Is my cousin going to be there? Are you picking me up? Can you come with me?" When R.B. took the child, she would cry and say to the foster father, "Can you just walk with me to the bus station?" After the visit, she would be very quiet in the evening.

## C. GAL's Report and Testimony

**{¶109}** The GAL for R.B.'s daughter filed a report before trial. He interviewed R.B., appellant, Great-grandmother Sanetta, the foster mother, and the agency's social worker. The GAL determined that the child was not of sufficient age or maturity to express her wishes. He attended several supervised visits and last observed the child at a visit in October 2011. He had not attended any in-home visits.

**{¶110}** In his report, the GAL noted the agency was critical of R.B. because of her lack of commitment with the agency and her inconsistent record with regard to visitation. However, since the birth of her second child in 2011, she has been more open and cooperative with the GAL. He observed her in the apartment she shared with her older

sister, which he found to be clean and appropriate for R.B. and her second child but inadequate for the addition of another child. He was told, however, that the social worker has yet to be able to get into that apartment on unscheduled visits.

{¶111} At the October 2011 visit, the GAL found that R.B. showed more appropriate behavior with her children. He also had a chance to talk to R.B.'s older sister and was impressed with the older sister's parental skills.

{¶112} The GAL reported a great deal of animosity and resentment that had developed between appellant, the agency, and the foster parents. He reported that R.B. followed appellant's advice closely. Meanwhile, appellant had not attended the visits consistently. The GAL expressed his concern about whether the appellant would protect and nurture the child if she were given custody.

{¶113} The GAL concluded that he was pleased with R.B.'s recent progress and that he was satisfied that her older sister would be available to assist R.B. if needed. He recommended that J.B. be returned to the legal custody of R.B., with protective supervision by CCDCFS.

{¶114} At the permanent custody hearing, the GAL commended the foster family for having done a good job raising the child, but he found R.B. to have matured over the course of the case and to have the ability to take care of two children. The GAL admitted he had not observed the child in the foster family's home since 2009 and had not observed the in-home visits. He felt that there would need to be a transition period and

the child would need time to bond with R.B. The GAL's testimony focused on R.B.'s maturity and ability to parent, but he offered little about the best interest of the child. There was no testimony from appellant or Great-grandmother Sanetta.

{¶115} On June 4, 2012, the trial court issued its decision committing R.B.'s daughter to the permanent custody of CCDCFS and denying all motions for legal custody.

{¶116} Appellant appealed from the trial court's decision in both cases. The appeals have been consolidated.[1]

### III. The Consolidated Appeal

{¶117} Appellant raises two assignments of error for our review. They state:

1. The trial court's denial of [A.C.] and other family members' motions for legal custody of her granddaughters and award of permanent custody to the Cuyahoga County Department of Children and Family Services was not in the best interest of the granddaughters and was against the manifest weight of the evidence.

II. The trial court erred in granting permanent custody to the Cuyahoga County Department of Children and Family Services, by directly contradicting the recommendations of the Guardian Ad Litem, and failing to explain its reasoning.

{¶118} These two assignments are related, and, for ease of discussion, we address together.

---

[1] S.B., R.B., and Great-grandmother Sanetta also appealed. Those appeals are separately before this court, in Nos. 98546, 98565, and 98518 and 98519, respectively.

**{¶119}** We begin with the recognition that "a parent's right to raise a child is an essential and basic civil right." *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). "The permanent termination of parental rights has been described as the family law equivalent of the death penalty in a criminal case." *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14. "All children have the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation." *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996). This court has emphasized that the "termination of the rights of a birth parent is an alternative of last resort." *In re Gill*, 8th Dist. No. 79640, 2002-Ohio-3242, ¶ 21. "The purpose of the termination of parental rights statutes is to facilitate adoption and to make a more stable life for dependent children." *In re Howard*, 5th Dist. No. 85 A10-077, 1986 Ohio App. LEXIS 7860, at *5 (Aug. 1, 1986).

### The Two-Prong Permanent Custody Analysis

**{¶120}** R.C. 2151.414 sets forth a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. R.C. 2151.414(B). It authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the four factors apply: (a) the child is not abandoned or orphaned, but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the

temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period. R.C. 2151.414(B)(1)(a)-(d).

{¶121} If any of these factors exists, the trial court proceeds to analyze whether, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency.

### First Prong:   R.C. 2151.414(B)(1) Factors

{¶122} R.C. 2151.414(B)(1) contains four factors. When the child is neither abandoned nor orphaned, the court considers the possibility of reunification ("whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents"), or whether the child has been in an agency's temporary custody for 12 out of 22 consecutive months.

{¶123}   Regarding the reunification factor, R.C. 2151.414(E) enumerates 16 factors for the trial court to consider as to whether the child should be placed with either parent. These factors include, among others, whether the parent failed to substantially remedy the conditions causing the removal of the child, despite reasonable case planning and diligent efforts by the agency, and whether the parent demonstrated a lack of commitment.

{¶124} The 12-of-22-consecutive-months provision affords parents 12 months to work toward reunification and the provision "balance the importance of reuniting a child

with the child's parents against the importance of a speedy resolution of the custody of a child." *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 21.

**{¶125}** Only one of the four factors must be present for the first prong of the permanent custody analysis to be satisfied.

<u>**Second Prong: Best Interest of the Child Analysis**</u>

**{¶126}** Once the juvenile court ascertains that one of the four factors listed in R.C. 2151.414(B)(1) is present, then the court proceeds to an analysis of the child's best interest.

**{¶127}** In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates that the juvenile court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

## Standard of Review

{¶128} R.C. 2151.414 requires the court to find, by clear and convincing evidence, (1) one of the factors enumerated in R.C. 2151.414(B)(1)(a)-(d), and (2) an award of permanent custody is in the best interest of the child. Clear and convincing evidence is that which will produce in the trier of fact "'a firm belief or conviction as to the facts sought to be established.'" *In re Adoption of Holcomb*, 18 Ohio St. 361, 368, 481 N.E.2d 613 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), at paragraph three of the syllabus. While requiring a greater standard of proof than a preponderance of the evidence, clear and convincing evidence requires less than proof beyond a reasonable doubt. *In re Parsons*, 9th Dist. Nos. 97CA006662 and 97CA006663, 1997 Ohio App. LEXIS 5141 (Nov. 12, 1997).

{¶129} As for our role in reviewing an appeal from the trial court's decision, a juvenile court's termination of parental rights and award of permanent custody to an agency is not reversed unless the judgment is not supported by clear and convincing evidence. *In re: Dylan C.*, 121 Ohio App.3d 115, 121, 699 N.E.2d 107 (6th Dist.1997).

## The Trial Court's Findings Regarding the First Prong

{¶130} Regarding the first prong, CCDCFS established, and the trial court found, that one of the four R.C. 2151.414(B)(1) factors existed for each child — the child has

been "in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period * * *."

{¶131} This finding is supported by the record. Pursuant to R.C. 2151.414(B)(1), for the purposes of this section, a child is deemed to have entered the temporary custody of an agency on the earlier date of the date the child is adjudicated as neglected or dependent, or the date that is 60 days after the removal of the child from home.

{¶132} Regarding Granddaughter-1 (S.B.'s daughter), the agency removed her from the home on January 29, 2009; thus, the date that is 60 days after the removal is March 29, 2009. The court adjudicated her to be neglected and dependent on July 30, 2009. The earlier of these two dates is March 29, 2009. The agency filed its motion for permanent custody on January 28, 2011. Therefore, under R.C. 2151.414(B)(1), the child is deemed to be in the temporary custody of CCDCFS for over 12 months — 22 months to be exact. Thus, the trial court's determination regarding the R.C. 2151.414(B)(1)(d) factor is supported by clear and convincing evidence in the record.

{¶133} Regarding Granddaughter-2 (R.B.'s daughter), the agency removed her from the home on January 29, 2009; thus, the date that is 60 days after the removal is March 29, 2009. The date the child was adjudicated as neglected and dependent is on June 16, 2009. The earlier date of these two is March 29, 2009. The agency filed its motion for permanent custody on July 10, 2010. Therefore, under R.C. 2151.414(B)(1),

J.B. is deemed to be in the temporary custody of CCDCFS for over 12 months — 15 months to be exact.

{¶134} Because one of the four R.C. 2151.414(B)(1) factors existed for both children, the factor set forth in R.C. 2151.414(B)(1)(a) — the possibility of placement with either parent within a reasonable time — is not determinative in this case. *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 21; *see also In re D.A.*, 8th Dist. No. 95188, 2010-Ohio-5618, ¶ 44. "The court does not need to determine that the child cannot or should not be placed with either parent within a reasonable time [when] the child has been in the temporary custody of one or more public children services agencies for more than 12 of the last 22 months." *In re M.H.*, 8th Dist. No. 80620, 2002-Ohio-2968, ¶ 25; *see* R.C. 2151.414(B); *see also In re William S.*, 75 Ohio St.3d 95, 99, 1996-Ohio-182, 661 N.E.2d 738.

{¶135} Although the trial court did not have to engage in an R.C. 2151.414(B)(1)(a) analysis, i.e., the possibility of placement with either parent within a reasonable time, the trial court did engage in such an analysis in each case, applying several pertinent factors enumerated in R.C. 2151.414(E), which, as we stated above, including whether the parent failed to substantially remedy the conditions causing the removal of the child, despite reasonable case planning and diligent efforts by the agency.

## A. Granddaughter-1 (S.B.'s child)

{¶136} Regarding Granddaughter-1, applying the R.C. 2151.414(E) factors, the trial court found that despite the agency's efforts to return the child to the home and provision of services to address S.B.'s anger management, emotional stability, education, and parental issues, S.B. has failed continuously and repeatedly to substantially remedy the conditions that caused J.B. to be placed outside of her home. Moreover, the trial court found that S.B. "has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child" (R.C. 2151.414(E)(4)), and was unwilling to provide for the child's basic necessities.

{¶137} Our review of the trial transcript supports the trial court's findings, as CCDCFS presented evidence to demonstrate that S.B. had failed to achieve the objectives of the case plan despite the various services and programs provided to her.

{¶138} S.B.'s attendance and participation in those services and school was an ongoing problem. She did, however, complete two parental skills programs (in the Dasi-Ziyad Family Institute and DePaul's Family Center).

{¶139} Although S.B. claims she completed most of the services required by the case plan, we first note that substantial compliance with a case plan is not dispositive of itself on the issue of reunification. It does not preclude a grant of permanent custody to a social services agency. *In re C.C.*, 187 Ohio App.3d 365, 2010-Ohio-780, 932 N.E.2d

360, ¶ 25 (8th Dist.).   It must be noted that because a parent completes the terms of a case plan does not mean she has achieved the ultimate goals of the plan or that, most importantly, she has substantially remedied the conditions that caused the children to be removed.   *Id*.   "The issue is not whether the parent has substantially complied with the case plan, but whether the parent has substantially remedied the conditions that caused the child's removal."   *In re McKenzie*, 9th Dist. No. 95CA0015, 1995 Ohio App. LEXIS 4618 (Oct. 18, 1995).

{¶140} Indeed, despite S.B.'s completion of two parental programs and despite the counseling services provided her to address her anger problem, she continued to display poor decision-making, which compromised the safety of the children in her care.   She continued to display an inability to control her anger outbursts.

{¶141} In an incident that occurred a month before the permanent custody hearing, S.B. left a three-year-old who was in her care unattended while she engaged in a fight. The fight again resulted in charges of delinquency against her.   She was also known to put her child on the hood of a car at 2:00 a.m. when the child did not sleep during one of the in-home overnight visits.

{¶142} S.B.'s case plan required her to attend her child's medical appointments so that she would understand the child's conditions and how best to address them.

{¶143} S.B.'s child had health problems that required significant medical attention.   S.B. participated in medical appointments when the foster mother provided

the transportation. Her participation stopped when she was responsible for her own transportation. On several occasions, she also appeared inattentive to her child's physical condition during the visits, conditions such as diaper rash and basic hygiene.

**{¶144}** Based on the trial testimony, we find there was clear and convincing evidence to support the trial court's determination under R.C. 2151.414(E) that Granddaughter-1 could not be placed with S.B. within a reasonable period of time. Despite reasonable case planning and diligent efforts by the agency, S.B. failed to remedy the conditions that caused her child to be placed outside the home.

### B. Granddaughter-2 (R.B.'s Child)

**{¶145}** Regarding Granddaughter-2, applying the R.C. 2151.414(E) factors, the trial court found that despite reasonable case planning and diligent efforts by the agency to assist R.B. to remedy the problems that initially caused her child to be placed outside the home, R.B. failed to remedy the conditions that caused the removal. The trial court found that relevant services were provided, but R.B. did not meet the objectives of her case plan designed to reunite her with her child. The trial court did recognize that R.B. now was no longer a minor, and she had made significant progress in the parenting part of the case plan and visitation with her daughter. However, the court found that R.B. had only made some progress in dealing with domestic violence and emotional stability issues. Further, the court found that she had made insufficient progress in the areas of schooling and obtaining her own housing.

{¶146} Our review of the trial testimony shows that during the course of the case, R.B. had been through six different schools and did not attend school on a regular basis. Although she, at one point, enrolled in GED classes and attended life skills classes, she did not complete her education and remained at a 10th or 11th grade level as of September 2011.

{¶147} R.B. was initially resistant to engaging in services to address her mental health needs, including depression and anger issues. Despite the counseling services provided to address her anger, and despite her attendance in counseling services through Murtis Taylor, there were still reports of her fighting in the community. Thus, the social workers deemed her emotional stability not to have been established.

{¶148} After R.B. reached the age of majority, the case plan was amended to include a housing component. There was evidence that R.B. had been residing in a home with her sister, and R.B. was named on the lease for a time. However, R.B. was continually back and forth between both appellant's home and her father's home, due to her conflicts with family members. Although there was evidence indicating that R.B. had recently applied for housing, consistency of the housing component of the case plan had not been established.

{¶149} The record reflects R.B. made progress on the parenting component of the case plan. She completed the parenting class in DePaul School. However, it took her a very long time to eventually complete another 16 weeks of sessions of parenting

programs. Even if the parental-classes part of the case plan is deemed completed, as this court has previously recognized, successful completion of a case plan is not dispositive in and of itself on the issue of reunification. It does not preclude a grant of permanent custody to a social services agency. *In re C.C.*, 187 Ohio App.3d 365, 2010-Ohio-780, 932 N.E.2d 360, ¶ 25 (8th Dist.).

{¶150} Therefore, although the trial court need not make the R.C. 2151.414(B)(1)(a) finding in this case, it did. And, based on the trial testimony, we find that there was clear and convincing evidence to support the court's determination that Granddaughter-2 cannot and should not be placed with R.B. within a reasonable time. Despite reasonable case planning and diligent efforts by the agency, she failed to remedy the conditions that caused her child's removal.

**The Trial Court's Findings Regarding the Second Prong (Best Interest of the Child)**

{¶151} R.C. 2151.414(D)(1)(a) through (e) set forth the relevant factors that a court should consider in determining the best interest of the child. The satisfaction of one of these enumerated factors permits an award of permanent custody. *In re D.A.*, 8th Dist. No. 95188, 2010-Ohio-5618, at ¶ 46; *In re Moore*, 8th Dist. No. 76942, 2000 Ohio App. LEXIS 3958 (Aug. 31, 2000), citing *In re Shaeffer Children*, 85 Ohio App.3d 683, 621 N.E.2d 426 (3d Dist.1993). In addition, this court has expressed the view that the discretion that a trial court has in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. *In re L.C.*, 8th Dist. No. 93657, 2010-Ohio-778, ¶ 16, citing *In re Satterwhite*, 8th Dist. No. 77071, 2001-Ohio-4137.

{¶152} As an initial matter, we recognize the children's GAL, who acknowledged he had not observed the children in their foster home for a while, recommended a denial of a granting of permanent custody, and recommended granting the legal custody of Granddaughter-1 to Great-grandmother Sanetta, and Granddaughter-2 to R.B. However, we note that a trial court is bound to consider, but not bound to adopt, a recommendation of the GAL, agency, or any other parties. The ultimate decision is for the judge. The court must act upon a consideration of all evidence presented. *In re T.S.*, 8th Dist. No. 92816, 2009-Ohio-5496, ¶ 34.

{¶153} Here, the trial court found by clear and convincing evidence that granting of permanent custody is in each child's best interest. The trial court considered the following: (1) the interaction and interrelationship of the child with her parents, siblings, relatives, and foster parents; (2) the custodial history of the child; and (3) the child's need for a legally secure placement and whether such a placement can be achieved without permanent custody.

### Granddaughter-1 (S.B.'s child)

{¶154} Regarding Granddaughter-1, applying these statutory factors, the trial court recognized that S.B. demonstrated love and affection for the child, but noted that "Mother became pregnant at 13. Now 17, mother lacks the maturity both as to her own needs and the needs to parent a child." The court observed that S.B. "has not consistently been compliant with home rules and expectations. At times, mother has failed to submit to the authority of the maternal grandparents, posing a risk to herself, the child and others." The trial court also found the likelihood of recurrence of neglect makes Granddaughter-1's placement with her a threat to the child's safety.

{¶155} The trial court considered whether other relatives were available for legal custody. Regarding appellant, the court made the following findings:

Maternal grandmother has made insufficient progress for reunification. Maternal grandmother continues to provide primary care for four minor children in her home, including the mother herein, and their needs; such that

maternal grandmother was not always able to get mother to appointments with the child herein, or to more than 30% of scheduled visits.

{¶156} The trial court concluded it is in the best interest of Granddaughter-1 to grant permanent custody to CCDCFS. Our own independent review of the record indicates the trial court had considered the requisite statutory factors, and its determination is supported by clear and convincing evidence contained in the record.

{¶157} The record reflects that Granddaughter-1 was removed when she was only three months old. Following placement into her current foster family in August 2009, she remained in that family for more than two years by the time the trial for permanent custody was held in November 2011.

{¶158} While S.B. visited with her child, she was often very late and at times relied on other family members to attend to the child's needs. When the agency instituted visits in the home, the visits had to be changed back to supervised visits because of mother's poor decision making. The GAL had concerns about S.B.'s behaviors and her delinquencies, was disappointed with her lack of concern for how her behavior would affect the custody of her child, and also expressed concern for the safety of the child if she were returned to S.B.'s care.

### Granddaughter-2 (R.B.'s child)

{¶159} Regarding Granddaughter-2, the record reflects that she was removed from R.B. when she was less than three months old. At the early visits, R.B. would hold her

and attend to her needs. However, the visits were mostly supervised and R.B. had other family members present to assist her at the visits. The foster family tried to include R.B. in her child's life. R.B. did not demonstrate interest in attending these events, which were provided for her to spend more time with her child outside of supervised visits.

{¶160} Social worker Sarah Narine testified that R.B. reported being overwhelmed with the care of her second child and believed the addition of a four-year-old would make the situation worse. Although R.B. eventually completed the parental classes provided in the case plan, her domestic violence and emotional issues have not been convincingly addressed. Regarding her housing issues, at the time of the custody trial, she was only able to produce a letter showing she received an assignment of an apartment unit. The GAL opined that although he thought the child should be returned to R.B.'s custody, R.B. would need a safety plan and protective supervision.

### Appellant's Suitability for Placement of the Children

{¶161} Appellant was inconsistent in attending the children's visits, has several minor children of her own, and indicated on several occasions that she was overwhelmed. According to social worker Narine, she also would get angry with Narine in front of Granddaughter-2. The GAL questioned whether appellant would protect and nurture the children if given custody. Additionally, the agency had concerns that she had been in a relationship with a man with a criminal history of offenses against children and appellant still referenced this individual in conversations.

{¶162} We further note that "[t]he statute does not make the availability of a placement that would not require a termination of parenting rights an all-controlling factor [and] does not even require the court to weigh that factor more heavily than other factors." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 63.

### Best-Interest-of the-Child Analysis for Both Children

{¶163} In both cases, we are aware that the children's biological family has clearly stated a desire for the children to be returned to them. At the outset, we underscore that family unity and blood relationships are vital factors that are to be carefully and fully considered. To do otherwise would be unconscionable. In this matter, we respect and commend the love and commitment some members of the children's biological family have demonstrated at various times. It is, though, well established that the trial court's first duty must be to ensure the well being of the child. To protect the child's interest, the biological relationship cannot be controlling in itself. *In re T.W.*, 8th Dist. Nos. 86084, 86109, 86110, 2005-Ohio-6633, ¶ 15. Nor is the existence of a good relationship, in itself, controlling. *Id*. The paramount consideration now and at each stage of these proceedings is the best interest of the children. All relevant factors must be considered when making that determination. R.C. 2151.414(D)(1).

{¶164} How then do we measure and assess the relevant factors that determine the best interest of the child? We must consider the full record before us. No child is truly safe, secure, and successful without dependable, consistent care. Each child needs to

know that they have a bed of their own. They need to be able to rely on consistent communication about learning healthy discipline. They need to know where and when they will have a nutritious breakfast each morning. They need to know that ensuring their safety and well being is the highest priority of their family each day.

{¶165} Reliance upon multi-generational sporadic care, which contributed to the children being removed from their biological family in the first place, cannot once again be accepted as the standard. These two young girls need a secure family setting; not to be passed around depending upon day-to-day convenience factors.

{¶166} Both S.B. and R.B., the teen mothers, made progress in participating in various programs. They completed portions of the programs. We are, of necessity, clearly aware that the best interest determination focuses on the child, not the parent. *In re D.A.*, 8th Dist. No. 95188, 2010-Ohio-5618, ¶ 53.

{¶167} The fact that these two children have been together in court-authorized agency supervised foster care for several successful years, with the same foster family, is a major factor in our decision. At numerous points along the way of the duration of their foster care, the trial court determined whether out-of-home placement would continue. The court determined several times over many months that the children's best interest was to remain with their foster family. From shortly after their birth until today, these two children have known one uninterrupted loving family experience. We do not believe

that rupturing that bond at this late date will make the children happier or safer. We will not do so.

{¶168} The record clearly reflects that these two children have developed a very close bond, a sense of security, with each other and with their foster family. Physically and emotionally, the foster family has provided a much needed steady, secure, and nurturing environment. The record reflects that both little girls are thriving in this environment. For the children's fundamental viability, we must and will weigh and balance their complete best interest. Families must be reunified whenever possible but never at the risk of jeopardizing innocent and vulnerable life. Both of these children are at the most critical developmental stage of their lives. They need to be cared for and nurtured in a stable, secure, and structured environment. Therefore, after a careful review of the transcripts of the trials, we agree with the trial court that such an environment can only be ensured by granting permanent custody of both children to the agency.

{¶169} We further recognize that the trial court's decision is consistent with the legislature's intent to encourage the timely placement of children into a permanent home. After being in temporary custody of the agency for almost all of their lives, permanency for both children is well overdue. "[N]eglected and dependent children are entitled to stable, secure, nurturing and permanent homes in the near term * * * and their best interest is the pivotal factor in permanency case." *In re T.S.* at ¶ 35.

**{¶170}** Upon a thorough review of the record in both cases, we find the trial court's determination is supported by clear and convincing evidence contained in the record.   The assignment of error is without merit.

**{¶171}** Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the juvenile court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
TIM McCORMACK, JUDGE

SEAN C. GALLAGHER, J., CONCURS;
LARRY A. JONES, SR., P.J., CONCURS IN PART, DISSENTS IN PART (WITH SEPARATE OPINION ATTACHED)

LARRY A. JONES, SR., P.J., CONCURRING IN JUDGMENT ONLY IN PART, AND DISSENTING IN PART:

**{¶172}** Respectfully, I concur in judgment only in part and dissent in part.   I concur in judgment only with the majority's opinion that the trial court did not err in denying the grandmother's motion for legal custody.   I dissent, however, and conclude

the trial court abused its discretion when it determined that the grant of permanent custody to CCDCFS was in the best interest of the children.

{¶173} The termination of parental rights is "the family law equivalent of the death penalty in a criminal case; therefore, parents must be afforded every procedural and substantive protection the law allows." (Citations omitted.) *In re D.A.*, 113 Ohio St.3d 88, 91, 2007-Ohio-1105, 862 N.E.2d 829. "The termination of parental rights should be an alternative of 'last resort.'" *Id.* citing *In re Cunningham*, 59 Ohio St.2d 100, 105, 391 N.E.2d 1034 (1979).

{¶174} Because both children had been in the custody of CCDCFS for more than 12 months out of a 22-month period, the trial court had only to conclude what was in the children's best interest pursuant to R.C. 2151.414(D).

### Grandaughter-1

{¶175} Based on my review of the record and trial transcripts, I would find that the trial court erred in granting the agency's motion for permanent custody; I disagree that it is in the child's best interest for the agency to take permanent custody.

{¶176} In considering the best interest factors in R.C. 2151.414(D), the first factor involves the interaction and interrelationship of the child with her parents, siblings, and other relatives and significant people in their lives. R.C. 2151.414(D)(1)(a). This best interest factor is "highly significant" and "focuses on a critical component of the permanent custody test: whether there is a family relationship that should be preserved."

*In re A.W.*, 9th Dist. No. 09CA009631, 2010-Ohio-817, ¶ 14, citing *In re C.M.*, 9th Dist.

No. 21372, 2003-Ohio-5040, ¶ 11.

**{¶177}** The majority of the evidence before the trial court on this factor weighs in favor of preserving the family relationship. The child's mother, S.B., participated in case plan services and has shown a bond with her child. She attended visitation, was loving towards her child, and was alert to her child's needs. Although the record evidenced that the child's mother is not ready to take custody of her daughter, if legal custody is granted to a family member, then the ties between mother and child, and between the child and her relatives, will remain. While I agree with the majority that the grandmother is not a suitable relative placement, the court should have granted legal custody to the great-grandmother.

**{¶178}** As to R.C. 2151.414(D)(1)(b), the GAL for the child reported that the child was too young to indicate her wishes. The GAL recommended against a grant of permanent custody, finding that a permanent sever of family ties was inappropriate because suitable family members were willing to take custody of the child and the extended family had demonstrated its commitment to the child. The GAL recommended legal custody be granted to the great-grandmother; finding that she would encourage visitation with and possible reunification of child with the mother, but would put the best interests of the child first, even if it conflicted with the mother's desires.

{¶179} In relation to the custodial history of the child under R.C. 2151.414(D)(1)(c), the majority places great emphasis that the child has been with her foster family a significant length of time.   While that is true, and there is a bond between the child and her foster parents, the child spent approximately 17 months in the agency's custody from when the motion for permanent custody was filed until the trial court ruled on the motion.   Although I understand that there were some issues that may have delayed the trial, to me, 17 months from motion filed to motion decided is an unacceptable length of time, especially given the young age of the child.   And while the child is bonded with her foster parents, she is also bonded with her biological family. The family should not be penalized because it took the court an extended period of time to dispose of the motion.

{¶180} Considering R.C. 2151.414(D)(1)(d), and whether the child's need for legally secure permanent placement can be achieved without a grant of permanent custody, the transfer of legal custody to a suitable relative, such as the great-grandmother, achieves that goal without taking the drastic step of permanently divesting the mother of her residual parental rights, privileges, and responsibilities.   *See generally In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188, paragraph one of the syllabus.

{¶181} Finally, in considering R.C. 2151.414(D)(1)(e), the factors listed in R.C. 2151.414(E)(7) to (11) include a parent's criminal convictions; whether the parent has withheld medical treatment or food from the child, has placed the child at substantial risk

of harm two or more times due to alcohol or drug abuse, or abandoned the child; and whether the parent has previously had her or his parental rights terminated as to another child. There is no dispute that none of the factors apply in this case; that fact weighs in favor of the mother and against a grant of permanent custody.

{¶182} Although the mother was only 13 years old when she gave birth to her daughter and is not currently ready to regain custody, the mother has a strong and loving family network. To permanently cut the bonds of this family to the child would not be in the child's best interests ,and the state failed to show otherwise by clear and convincing evidence.

{¶183} In light of the above, I would find that the trial court abused its discretion in granting the motion for permanent custody.

### Granddaughter-2

{¶184} I would also find that the trial court abused its discretion in granting permanent custody of Granddaughter-2 to the agency and that legal custody should be awarded to the child's mother.

{¶185} In considering the interaction and interrelationship of the child with her mother, siblings, other relatives and significant people in their lives pursuant to R.C. 2151.414(D)(1)(a), the majority of the evidence before the trial court weighed in favor of preserving the family relationship. The child's mother had completed her case plan, was bonded with her child, who called her "mommy" and verbally expressed her love for her

mother; was raising her second child without CCDCFS's involvement; and was in the process of securing her own housing. She attended visitation every week, was appropriate and loving towards her child, and was alert to her child's needs. The social worker, GAL, and foster mother all testified that the mother had matured while the child was in agency custody. The mother has undeniable family support, especially that of her older sister, grandmother, and mother.

{¶186} The GAL for the child reported that the child was too young to express her wishes but recommended against a grant of permanent custody, finding that the mother had matured and would be able to take care of her daughter, he observed her acting appropriately with both of her children, she took good care of her younger child, and had the assistance of her family, including her older sister, who displayed good parenting skills.

{¶187} In relation to the custodial history of the child, R.C. 2151.414(D)(1)(c), over a year and a half elapsed from the time the motion was filed until it was granted. While I am cognizant that there was an intervening appeal filed by the foster parents and that these matters take some time, a year and a half in the life of a young child is too long for a motion of this kind to be pending. Again, the family should not be penalized for the trial court's delay.

{¶188} Considering R.C. 2151.414(D)(1)(d), and whether the child's need for legally secure permanent placement can be achieved without a grant of permanent

custody, the evidence overwhelmingly showed that the mother herself could provide a stable, permanent home for the child. She does, however, continue to need the services and guidance offered by CCDCFS; thus, I would recommend that placement with the mother be accompanied by protective supervision.

{¶189} Finally, in considering R.C. 2151.414(D)(1)(e), there is no dispute that none of the factors apply to the mother. And the fact that none of these factors apply weighs in favor of the mother and against a grant of permanent custody.

{¶190} I must comment that while the majority states that "multi-generational sporadic care" contributed to the children being removed in the first place and cannot be accepted; that the children should not be "passed around depending upon day-to-day convenience factors," there is no evidence that would occur in this case. The great-grandmother, who I advocate should have custody of granddaughter-1, picked up her entire life and moved cross-country to assist her family. She has proven her dedication to both mothers and their children and has shown her ability to care for the child. As for granddaughter-2, I advocate that the mother have full legal custody of her daughter as she currently has of her younger son.

{¶191} Moreover, many families in our community thrive on multi-generational care — "it takes a village to raise a child," and this family has that village. The family may not be perfect, few are, but that does not mean that we should permanently sever the ties these two young children have with their biological family.

{¶192} The trial court's decision to grant permanent custody of the children to CCDCFS was not supported by competent, credible evidence. Accordingly, I would conclude that the trial court abused its discretion when it determined that permanent custody was in the best interest of the children. I would: (1) affirm the trial court's denial of grandmother's mother for legal custody; (2) reverse the trial court's grant of permanent custody to CCDCFS; (3) grant legal custody with protective supervision of Granddaughter-1 to the great-grandmother; and (4) grant legal custody with protective supervision of Granddaughter-2 to her mother.