**In re C.C. et al., Minor Children.**

**[Appeal by Father, B.C.]**

[Cite as *In re C.C.*, 187 Ohio App.3d 365, 2010-Ohio-780.]

Court of Appeals of Ohio, Eighth District, Cuyahoga County.

Nos. 94013 and 94014.

Decided March 4, 2010.

Timothy R. Sterkel, for appellant, B.C.

William D. Mason, Cuyahoga County Prosecuting Attorney, and James M. Price, Gina S. Lowe, and Cheryl Rice Lane, Assistant Prosecuting Attorneys, for appellee, Cuyahoga County Department of Children and Family Services.

Troy M. Hough, guardian ad litem.

---

MELODY J. STEWART, Judge.

{¶ 1} This appeal by appellant-father, B.C., consolidates for hearing and disposition separate appeals involving the court's decision to terminate his parental rights to his son, C.C., and daughter, Ci.C., and grant permanent custody of the children to the Cuyahoga County Department of Children and Family Services. The father argues that the court erred by granting the agency's motion for permanent custody because the agency failed to establish the statutory factors by clear and convincing evidence. We have expedited the hearing and disposition of these appeals as required by App.R. 11.2(C).

I

{¶ 2} The father first argues that the court erred by proceeding with the dispositional phase of the proceedings because it failed to give the Cherokee tribe notice of pending custody proceedings relating to the daughter as required by the Indian Child Welfare Act ("ICWA"), codified in Section 1912, Title 25, U.S.Code.[1]

{¶ 3} The ICWA was enacted to state "the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture * * *." Section 1902, Title 25, U.S.Code. The act gives tribal authorities exclusive jurisdiction over any state relating to "any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe." Section 1911(a), Title 25, U.S.Code. If an Indian child does not reside in or is not domiciled within the reservation of a tribe, custody proceedings may be initiated in a state court. Section 1911(b), Title 25, U.S.Code. However,

---

1. We are aware that testimony showed that the mother and father separated for a time during the marriage and that the mother claimed that the daughter had been fathered by another man during this period. However, a presumption of paternity exists when a child is born during a marriage, R.C. 3111.03(A)(1), and there is no other proof of paternity to rebut this presumption. So we analyze this assignment of error by presuming the father's paternity.

"in the absence of good cause to the contrary, [the state court] shall transfer such proceeding to the jurisdiction of the tribe." Id. Notice must be given to the tribe "[i]n any involuntary [child-custody] proceeding in a State court, where the court knows or has reason to know that an Indian child is involved." Section 1912(a), Title 25, U.S.Code.

{¶ 4} In order to invoke the provisions of the ICWA, there must be a preliminary showing that a custody proceeding involves an "Indian child." *In re Jordan* (Jan. 30, 2002), 9th Dist. Nos. 20773 and 20786, 2002 WL 121211. "Indian child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." Section 1903(4), Title 25, U.S.Code. The party who asserts the applicability of the ICWA bears the burden of proving that a child meets the statutory definition of an "Indian child." *Jordan,* supra. To meet this burden, the party asserting the applicability of the ICWA must do more than raise the possibility that a child has Native American ancestry. *In re B.S.,* 184 Ohio App.3d 463, 2009-Ohio-5497, 921 N.E.2d 320, at ¶ 63.

{¶ 5} The father offered no evidence to prove that the daughter was a member of an Indian tribe, nor did he offer proof that the daughter was the biological child of a member of an Indian tribe. During an initial hearing, the court asked the parents whether either child had any "American Indian heritage." The father replied, "Great-grandmother." The court asked whether the great-grandmother was a "member of a recognized tribe," and the father replied, "Cherokee."

{¶ 6} Regardless of whether the great-grandmother was a member of a Cherokee tribe,[2] the father did not establish his own membership in a tribe. He thus failed to prove that the daughter was the biological child of a member of an Indian tribe, so she did not meet the statutory definition of an "Indian child." It follows that the court had no duty to give any tribal government notice of the custody proceedings.

## II

{¶ 7} The father next argues that the court erred by terminating his parental rights and granting permanent custody of the children to the agency. He maintains that the evidence showed that he fully complied with the agency's case

---

**2.** The federal government recognizes only three Cherokee tribes: the Cherokee Nation, the Eastern Band of Cherokee Indians, and the United Keetoowah Band of Cherokee Indians. 73 F.R. 18553–18557. The father did not specify to which of these tribes the great-grandmother belonged.

plan and had been doing everything that had been required of him, so the court erred by granting the agency's motion for permanent custody.

## A

{¶ 8} In order to terminate parental rights and grant permanent custody to the agency, the court must apply a two-prong test. First, the court must find by clear and convincing evidence one of the factors set forth in R.C. 2151.414(B)(1) through (4). Second, the court must determine, by clear and convincing evidence, that it is in the best interest of the child to terminate parental rights. R.C. 2151.414(B)(2). The court terminated parental rights by finding clear and convincing evidence that (1) the children had not been in the temporary custody of the agency for 12 or more months of a consecutive 22–month period and the children could not be placed with either parent within a reasonable time or should not be placed with either parent, see R.C. 2151.414(B)(1)(a), and (2) permanent custody was in the best interest of the children. The father makes no argument that the court erred by finding permanent custody to be in the best interest of the children, so we limit our discussion to the issue whether the children could be placed with either parent within a reasonable time.

{¶ 9} When determining whether children can be placed with either parent within a reasonable period of time, the court must consider R.C. 2151.414(E). That section states that if the court determines at a hearing that one or more of the factors set forth in R.C. 2151.414(E) exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent.

{¶ 10} The court determined that the factors set forth in R.C. 2151.414(E)(1), (4), (11), and (14) existed. However, the existence of any one of these factors is sufficient to determine that the children cannot be placed with the father within a reasonable period of time. See *In re William S.* (1996), 75 Ohio St.3d 95, 99, 661 N.E.2d 738. We therefore focus, as does the agency, on the R.C. 2151.414(E)(1) factor:

{¶ 11} "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material

resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties."

{¶ 12} In *In re Z.T.*, 8th Dist. No. 88009, 2007-Ohio-827, 2007 WL 613998, ¶ 44, we stated:

{¶ 13} "A R.C. 2151.414(E) determination that a child cannot or should not be placed with his parents within a reasonable time is a finding of fact. This conclusion necessarily flows from the use of the term 'clear and convincing evidence' as the standard to be applied by the court. Moreover, the determination itself is mandatory — if the court finds, as a matter of fact, that any one of the factors set forth exists, it 'shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent * * *.' We review this determination under the manifest weight of the evidence standard of review. A claim that a factual finding is against the manifest weight of the evidence requires us to examine the evidence and determine whether the trier of fact clearly lost its way. *In re M.W.*, Cuyahoga App. No. 83390, 2005-Ohio-1302[, 2005 WL 678111]."

## B

{¶ 14} The agency's complaint for temporary custody, as amended, alleged that in 1990, while serving in the military, the father sexually abused two young biological sons from another relationship and served 30 months of a three-year sentence. The complaint alleged that the father did not appear to have remorse for his past behavior and behavioral assessments showed him at risk of reoffending.

{¶ 15} Although there were no specific allegations that the father had committed acts of sexual abuse against any of his children after his release from prison, the agency removed the father's stepdaughter from the home after she complained that when she was 11 to 12 years old, the father would wake her in the morning by rubbing her legs — an action that he continued to take even after she asked him to stop. A social worker testified that the stepdaughter had been sexually abused by another man when she was seven years old, and a psychiatrist who testified for the agency thought that the father's continued touching of the stepdaughter's legs showed a lack of "empathy or compassion" for her. When asked about the touching, the father claimed that he was not aware that his conduct bothered the stepdaughter. This sense of disassociation had apparently been longstanding. When asked to explain what prompted him to sexually abuse his other children in 1990, the father mentioned that he had seen a movie in which a child was kidnapped and sexually abused over a period of years, and he thought that if the antagonist in the movie "can get away with it, why can't I?"

{¶ 16} The social worker said she favored removing the children from the home because of her concern over the father's conduct as detailed in the stepdaughter's allegations. The social worker conceded, however, that the agency investigated the stepdaughter's allegations against the father and concluded that they were unsubstantiated because there had been no touching of the private parts. Despite this finding, the social worker testified that the father may have been engaging in "grooming" behavior with the stepdaughter. She described this behavior as failing to honor personal boundaries by engaging in touching that made the person being touched uncomfortable. She also noted that grooming conduct implied to the stepdaughter that she had the responsibility to control his behavior; for example, in reference to clothing worn by the stepdaughter, the father once said to her, "Don't tempt me." The social worker characterized grooming behavior as incremental, moving slowly with various kinds of touching to determine how far touching could be taken.

{¶ 17} The psychiatrist testified that the father had been abused as a child and had not come to terms with the emotional impact of how that abuse victimized him. The psychiatrist also noted that the father had also not come to terms with how his own victimization might affect his children. The psychiatrist acknowledged that the father had been in group therapy due to cost but said that the father needed more intensive, individual therapy. When asked for his opinion on whether the father would be at risk of reoffending were he to live in a home with young children, the psychiatrist stated, "If [the father] did not engage in individual psychotherapy and there was an emotional disconnect as it is now, I would think it would be high." Despite this opinion, the psychiatrist conceded that the father scored in the low to moderate range in tests conducted to ascertain his likelihood of sexually reoffending in the future.

{¶ 18} The social worker confirmed that the father tested "low risk" for sexually reoffending in the future. She testified that the results of a second test of "dynamic" factors relating to reoffending likewise showed him to be a low or moderate risk to reoffend and that the results "did not indicate a persistent sexual attraction to male preschool or grade school children as well as female." The social worker did, however, note that the father tested in the high range on the social desirability scale, meaning that he failed to admit to "normal everyday human characteristics" like anger or impatience. She said that a realistic understanding of these vulnerabilities or faults would assist the father and his therapist in working on his issues.

{¶ 19} The social worker also expressed concern for the attitude of the mother, L.C.[3] Describing the father as controlling, the social worker testified that the

---

3. The mother has filed two separate appeals, Cuyahoga App. Nos. 94011 and 94012, which were consolidated for hearing with the appeals in this case.

mother placed more blame for the situation on the stepdaughter for the circumstances leading to the motion for permanent custody. She thought that the mother's refusal to hold the father completely accountable for his actions placed the other children at risk.

{¶ 20} The agency's case worker testified that the father had been engaged in group therapy as opposed to individual therapy because it was more cost-effective for him. She could not, however, verify the father's progress in therapy because he told the group-therapy counselor not to speak with the case worker.

{¶ 21} The case worker also testified that the father continued to try to contact the stepdaughter even though he had been told not to. These attempts at contact made the stepdaughter uncomfortable, and the case worker learned that the father had posted the stepdaughter's pictures on Internet social-networking sites. This situation was exacerbated by the mother, who told the stepdaughter that she should be nice to the father because he was going to buy her a cell phone. Other evidence showed that the father arranged to have the mother deliver a card to the stepdaughter during a visit (the father and stepdaughter were separated during the visit). The card contained a note from the father that stated, "Everyone wants me * * * gone and I will not give up that easy. I may move out, but I will not be out of your lives!"

{¶ 22} The case worker also testified that housing had become problematic for the father. He was employed as a truck driver (the mother was unemployed) earning between $1,000 and $1,500 per month. With rent being $750 per month, excluding utilities, he was more than $5,000 in arrears on the rent. However, the case worker conceded that despite being in arrears on the rent, the father and mother had signed a new, one-year lease for the premises. The parents remained confident that the landlord, a member of their church, would not evict them.

## C

{¶ 23} The father argues that the evidence did not clearly and convincingly show that he failed to remedy the conditions that caused the children to be taken from the home, because he had fully complied with the agency's case plan.

{¶ 24} The agency relied primarily on the R.C. 2151.414(E)(1) factor: whether, despite reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside their home. The "diligent efforts" required of the agency under this section are typically set forth in a case plan adopted pursuant to R.C. 2151.412. The goals of any case plan are

(1) to achieve a safe out-of-home environment for the children during their removal and (2) to eliminate with all due speed the need for an out-of-home placement so that the children can return home. R.C. 2151.412(F)(1).

■ {¶ 25} A parent's successful completion of the terms of a case plan is not dispositive on the issue of reunification. The ultimate question under R.C. 2151.414(A)(1) is whether the parent has substantially remedied the conditions that caused the child's removal. *In re Shchigelski* (Oct. 20, 2000), 11th Dist. No. 99–G–2241, 2000 WL 1568388; *In re McKenzie* (Oct. 18, 1995), 9th Dist. No. 95CA0015, 1995 WL 608285. A parent can successfully complete the terms of a case plan yet not substantially remedy the conditions that caused the children to be removed — the case plan is simply a means to a goal, but not the goal itself. Hence, the courts have held that the successful completion of case-plan requirements does not preclude a grant of permanent custody to a social services agency. *In re J.L.*, 8th Dist. No. 84368, 2004-Ohio-6024, 2004 WL 2578874, at ¶ 20; *In re Mraz*, 12th Dist. Nos. CA2002–05–011, CA2002–07–014, 2002-Ohio-7278, 2002 WL 31883343.

■ {¶ 26} When counseling is a stated goal in a case plan, it presupposes that counseling will work to remedy the conditions causing the children to be placed outside the home. By no means does the completion of any form of counseling suggest, by itself, that the parent has remedied the condition that led to a child's removal from the home. The goals of any form of counseling are to give the patient insight into a problem and teach the skills necessary to deal with the problem. When counseling is required for a severe or chronic condition like drug abuse, a significant period of counseling may be required — a period that extends beyond the time frame encompassed in the case plan.

{¶ 27} During the adjudicatory phase of the proceedings, the father admitted count 7 of the agency's complaint, which stated that he "remains at risk for sexual offending." The case plan required the father to "attend, participate and successfully complete sexual abuse counseling." In addition, the case plan called for the father to "learn to live a lifestyle free of sexual abuse and become aware of appropriate and inappropriate touching to reduce the risk of abuse and neglect to the children."

{¶ 28} Despite completing the case-plan requirement for sexual-abuse counseling, the agency offered evidence to show that this counseling did not remedy the high risk that the father continued to pose to the children. Two witnesses for the agency, a psychiatrist and a social worker, gave their opinion that the father failed to gain insight as to how the sexual abuse he suffered as a child influenced his own conduct with the stepdaughter. The primary result of the sexual abuse suffered by the father was that it left him with a lack of empathy or compassion.

The father's 1990 sexual abuse against two of his children and his chilling explanation for his acts proved this point: he watched a movie in which a character kidnapped and raped a child and thought that if this movie character could "get away" with it, he could, too.

{¶ 29} In the opinion of both the psychiatrist and the social worker, this lack of empathy continued to the present time. Particularly disturbing to the psychiatrist was the father's continued stroking of the stepdaughter's leg despite her requests for him to stop. The psychiatrist concluded that the father's refusal to see that his actions were bothering the stepdaughter showed an "emotional disconnect" or lack of empathy because he refused to honor the stepdaughter's personal boundaries. The social worker likewise found it disturbing that the father refused to see that his act of stroking the stepdaughter's legs was wrong, claiming that he "wasn't aware that it bothered her that much." This statement, along with his "Don't tempt me" comment regarding the stepdaughter's clothing, caused the social worker to conclude that the father was putting the responsibility to control his behavior on the stepdaughter, showing that he remained nonempathic and thus unable to see how his actions affected others. Evidence showing that the mother had been enabling his conduct by downplaying the seriousness of his actions, the social worker concluded that the father was grooming the stepdaughter with no consequences from the mother, thus putting the other children at risk.

{¶ 30} Added to this evidence of emotional disconnect was the psychiatrist's concern that the father might have been attempting to hide that aspect of his personality during the custody proceedings. The psychiatrist said that test results could be interpreted to show that the father "may have attempted to present himself in an unrealistically favorable picture of his virtue and moral values." Moreover, the psychiatrist thought that the father felt the need "to present an image of strong moral character or deny human frailties," leading him to conclude that the father had "a rather naive or unsophisticated self-appraisal." While the psychiatrist did concede that the father's test results might have been the product of confusion from the test questions, the agency could very plausibly argue that the father's attempts to paint his moral values in a favorable light were suggestive of a broader lack of empathy or compassion that could place the children at risk. The psychiatrist testified that most sexual offenders see their victims not as individuals, but objects. Once the sexual offender starts viewing victims as objects with no personality to harm, the door is opened to abuse because the offender believes that he can do what he wants with the victims.

{¶ 31} Every expert for the state agreed that the children would be at risk if they remained with the father. They reached this conclusion despite the father's having completed the case-plan requirement for counseling because they agreed

that the father had not yet developed insight into his actions; namely, his lack of empathy and his objectification of others. Indeed, the evidence could reasonably be construed to show that rather than benefit from counseling, the father acted to cover up his failings. The court could view this evidence as clearly and convincingly showing that the father had not remedied the conditions that caused the children to be removed from the home, so its finding that the agency established the R.C. 2151.414(E)(1) factor was not against the manifest weight of the evidence.

## III

{¶ 32} For his third assignment of error, the father complains that he did not receive the effective assistance of counsel, because counsel did not call any witnesses on the father's behalf and relied solely on cross-examination of the agency's witnesses.

{¶ 33} To show ineffective assistance of counsel, the father must first establish that counsel's performance was deficient by showing that counsel committed errors so serious that he or she was not, in effect, functioning as counsel. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Second, the father must demonstrate that these errors prejudiced his defense so that there exists a reasonable probability that were it not for counsel's errors, the outcome of the hearing would have been different. *State v. Bradley* (1989), 42 Ohio St.3d 136, 143, 538 N.E.2d 373.

{¶ 34} We presume that a licensed attorney renders competent representation. *State v. Lott* (1990), 51 Ohio St.3d 160, 174, 555 N.E.2d 293. Because of this presumption, a party claiming the ineffective assistance of counsel due to counsel's failure to call witnesses bears the burden, under the first prong of the *Strickland* test, of identifying witnesses who should have been called at trial and describing for the court what their testimony would have entailed. See *State v. Stivender*, 2d Dist. No. 19094, 2002-Ohio-6864, 2002 WL 31780953, at ¶ 19; *State v. Bartimus*, 7th Dist. No. 02 BA 5, 2003-Ohio-807, 2003 WL 404475, at ¶ 9. Absent some sense of who the witnesses would have been and what they would have testified to, a reviewing court will have no basis for overcoming the presumption that counsel acted competently.

{¶ 35} The father does not identify any witnesses that counsel could have called, nor does he suggest what testimony these witnesses might have given. He thus fails to overcome the presumption of competent representation. In addition, he makes no argument on the second prong of the ineffective-assistance-of-counsel test—showing by a reasonable probability how the testimony of any other witnesses would have affected the outcome of the trial. See *United States*

*v. Berry* (C.A.9, 1987), 814 F.2d 1406, 1409. We therefore have no basis for evaluating the father's vague assertion of ineffective assistance of counsel.

Judgment affirmed.

KILBANE, P.J., and BLACKMON, J., concur.

