[Cite as *In re RA.E.*, 2018-Ohio-4700.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 107062**

---

**IN RE:   RA.E., ET AL.**
**Minor Children**

[Appeal By A.T., Mother]

---

**JUDGMENT:**
AFFIRMED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD 16905068 and AD 16905069

**BEFORE:**   Boyle, J., Stewart, P.J., and Jones, J.

**RELEASED AND JOURNALIZED:**   November 21, 2018

**ATTORNEYS FOR APPELLANT**

Jonathan N. Garver
The Brownhoist Building
4403 St. Clair Avenue
Cleveland, Ohio   44103


**ATTORNEYS FOR APPELLEES**

**For C.C.D.C.F.S.**

Michael C. O'Malley
Cuyahoga County Prosecutor
BY:    Feisul M. Khan
          Michael F. Kulcsar
          Cheryl Rice
Assistant Prosecuting Attorneys
3955 Euclid Avenue, Room 305E
Cleveland, Ohio   44115

**For A.E., Father**

Wildon V. Ellison
12020 Lake Avenue, Suite 205
Lakewood, Ohio   44107

**Guardian Ad Litem**

Thomas Kozel
P.O. Box 534
North Olmsted, Ohio   44070


MARY J. BOYLE, J.:

{¶1}    Appellant, A.T. ("mother"), appeals the juvenile court's judgment granting

permanent custody of her minor children, Ra.E. (born in August 2014) and Ro.E. (born in August

2015), to the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "agency"). Mother raises one assignment of error for our review:

> The termination of Appellant's parental rights and the award of permanent custody to the Agency is against the manifest weight of the evidence and constitutes a denial of due process of law.

**{¶2}** Finding no merit to mother's appeal, we affirm.

## I. Procedural History

**{¶3}** On March 29, 2016, the children were removed from mother's care pursuant to an ex parte telephonic order after the "mother and father were involved in a domestically violent altercation in the home of the father" three days earlier. During the altercation, the mother and Ra.E. sustained injuries that required medical attention. CCDCFS alleged that mother "failed to appreciate the severity of the incident." Further, mother was not cooperative with police in attempting to retrieve Ro.E., who was also present during the altercation and was still in father's care.

**{¶4}** The following day, CCDCFS moved for predispositional ("emergency") custody of the children. CCDCFS simultaneously filed a complaint requesting temporary custody of the children, alleging that the children were abused and neglected. CCDCFS explained that during the March 26 incident, mother sustained an injury to her jaw, and Ra.E. sustained an injury to his face. CCDCFS further alleged that mother "has a substance abuse problem, specifically marijuana, which interferes with her ability to provide appropriate care for the children," and that she tested positive for marijuana during her pregnancy with Ro.E.[1]

**{¶5}** After a predispositional hearing was held on March 30, the juvenile court granted CCDCFS's motion, placing the children in the emergency temporary custody of CCDCFS. The

trial court appointed a guardian ad litem ("GAL"), and a case plan was filed with the goal being reunification with the parents. The children were placed with the paternal grandmother. Under the case plan, mother and father were supposed to attend domestic violence classes, be able to provide for the children's basic needs and obtain and maintain safe and stable housing, engage in community services from Community Collaborative and Help Me Grow to reduce the risk of harm and neglect to the children, complete a drug and alcohol assessment and engage in any services that were recommended, maintain sobriety and participate in random drug screens, and visit the children for two hours once a week.

{¶6} The trial court adjudicated the children abused in July 2016 and, in October 2016, granted temporary custody to the agency after a dispositional hearing.

{¶7} On November 1, 2016, CCDCFS moved to modify temporary custody to permanent custody. At the time of this filing, CCDCFS stated that mother had not visited the children since June 2016, and father had not visited them since April 2016. CCDCFS further stated that mother and father had not completed any of their case plan objectives.

{¶8} On February 13, 2018, the day the permanent custody hearing was scheduled to occur, mother and father filed a joint motion for legal custody to paternal grandmother. Attached to the motion was a "Legal Custodian's Statement of Understanding for Legal Custody," signed by the paternal grandmother. Also pending was a motion for custody that father had previously filed.

{¶9} The hearing on CCDCFS's permanent custody motion ultimately took place on February 20, 2018. The trial court continued the hearing from February 13 because the GAL originally had not filed his report within seven days of the trial.

---

[1] It was later established that mother also tested positive for marijuana during her pregnancy with Ra.E.

**II. Permanent Custody Hearing**

### A. Supportive Visitation Coach

{¶10} Kathleen Steponick testified that she is a supportive visitation coach for Ohio Guidestone. She explained that supportive visitation is a 16-week program where she oversees a parent's two-hour visit with a child and makes parenting recommendations to the parent during the visit. During the visit, the parent is supposed to meet all of the child's needs, "including food, beverage, whatever the child may need," as if the parent was home alone with the child. She also said that the parent must "engage" with the child, which includes playing on the floor with the child and redirecting the child's behavior if necessary "by giving choices and following through with consequences." The parent is also supposed to cooperate with professionals and staff and learn knowledge about child development.

{¶11} Steponick stated that she worked with mother and the children for 13 weeks of the 16-week program, from November 2016 to February 2017. She stated that mother had "a great bond with her children." According to Steponick, mother was always cooperative and listened to Steponick's recommendations.

{¶12} At the time of the visits, the children were one and two years old, so they "were into almost anything and everything." Steponick explained that when the children would "shove" each other or pull each other's hair, mother would just laugh at them because she thought it was cute. Steponick stated that she told mother that she had to redirect the children by giving them choices, or if necessary, to separate them and put them in time-out when needed.

{¶13} Steponick testified that when mother came, she "always came in with a bag and in the bag was always lotion for their hair and hair products, and lotion to put on their skin." She would also bring snacks for the children some of the time, but "because of the distance, she had

to rely on someone else for transportation, so she did not always have time to stop and get a snack for the children." Mother was living in Medina at that time and the visits were in Lorain, so mother did not consistently bring snacks. Steponick agreed, however, that the visits were at the same time each week and that mother could have planned better.

{¶14} While Steponick stated that mother never raised her voice toward the children, she explained that during some visits, mother would get upset about something and then just focus on her negative emotions rather than focus on the children. For example, Steponick stated that mother would get upset because she did not believe that the foster mother was caring for the children properly. Steponick would "redirect" mother and remind her that she was there to visit with her children.

{¶15} When the 16 weeks of visitation were over, Steponick stated that mother "did grow during the process." Steponick explained that Ohio Guidestone suggested to the agency that mother take a 12-week "nurturing parenting" class, which is a 12-week program where mother would learn how to properly care for and bond with her children.

**B. Psychologist**

{¶16} Dr. Randall Baenen, a psychologist, testified that he had been conducting custody evaluations for the juvenile court for over 25 years. In July 2017, he evaluated mother. He explained that part of his evaluation was to determine if there "were clinical concerns that needed to be incorporated" into mother's case plan. He wrote a report regarding his evaluation and submitted it to the court. Dr. Baenen testified that mother did not have any mental illnesses that prevented her from parenting or completing her case plan. But he explained that due to the instability, trauma, and neglect that mother faced as a child, he recommended personal counseling for mother. In his opinion, mother lacked focus and had difficulty organizing and

prioritizing her life, which reflected the "chaos and neglect" mother experienced as a child. Dr. Baenen also said that mother had difficulty with "social stability" both in terms of "frequent moves of residences and also transportation issues."

{¶17} Dr. Baenen administered the Minnesota Multiphasic Personality Inventory assessment to mother. He explained that in this assessment, people respond to questions about themselves. He could not interpret the results of mother's test, however, because mother denied 13 out of 15 "personal flaws" about herself. He explained that mother was "clearly not acknowledging" something about herself or she lacked personal self-awareness. Dr. Baenen explained that self-awareness was "critical to dealing" with problems and taking responsibility for them.

{¶18} Mother reported to Dr. Baenen that she had trouble completing her case plan. She told him that the six classes were expected of her, but that it was difficult to do that while working and trying to obtain her GED. Mother told Dr. Baenen that "a number of the resources that she needed to access were downtown," but that she was living in either Medina County or Lake County and that she had transportation issues. At the time of the evaluation, mother was working at Circle K.

{¶19} Mother told Dr. Baenen that she loved her children, but that they were hard to control. She said that she wondered if they took her "seriously." Dr. Baenen believed that mother's statement about her children taking her seriously was problematic because the children were only two and three years old at that time. Dr. Baenen stated that the children were so young that it was "an interesting characterization to talk about them having intentional disregard for her." He also saw this as a statement "of [mother's] own difficulties, feeling effective in raising her children."

{¶20} Mother told Dr. Baenen that she did not regularly drink alcohol, but she did smoke marijuana two to three times a week. She tested positive for marijuana during the third trimester of her pregnancy with her first child, which she used to treat severe morning sickness. Mother also told Dr. Baenen that the children's father had a temper "and at times acted physical towards her." But mother still believed that father was a decent person who "has his issues."

{¶21} Dr. Baenen concluded that mother "has reportedly, not meaningfully, addressed her case plan despite having over a year and a-half to do so. Not only does this raise concerns about her capacity for organized and effective functioning, but also her commitment to the children." Dr. Baenen explained that a year and a-half of an infant's life is a very long time "given the critical issues of bonding and attachment." Dr. Baenen found mother's "lack of organization and/or urgency" to be "striking" given that she had a year and a- half to complete her case plan. He said that although he had not seen mother with her children, he had "serious concerns for her capacity to effectively organize parenting of two children on her own."

**C. Social Worker**

{¶22} Amy Norris, the social worker, testified that she had been on the case since the beginning. She explained that when the complaint was filed, domestic violence was a concern due to the incident in March 2016, as well as past domestic violence between the parents. She stated that there had been another incident of domestic violence between the parents in 2015. Substance abuse was also a concern, specifically marijuana, because Ra.E. was born with marijuana in his system. At the time of the filing of the complaint, mother and father did not have stable housing and were living with different relatives. Both parents were also unemployed at that time.

**1. Domestic Violence**

**{¶23}** Norris stated that she referred mother to the Domestic Violence and Child Advocacy Center in May 2016, November 2016, and November 2017. Norris testified that mother never completed the domestic violence portion of her case plan. Norris also referred father four times, and he never attended any classes either.

**{¶24}** Norris explained that in the beginning, mother did not "engage" in domestic violence classes because she did not believe that it was necessary. Mother later told Norris that she had transportation issues. Norris could not recall if mother ever asked her for a bus pass, but stated that mother "would always * * * find another form of transportation." Because of mother's transportation issues, however, Norris referred mother to Choices because the counselor would go to mother's home to provide the service. Norris spoke to the counselor at Choices who told Norris that mother "said that she wasn't interested in services." Norris further stated that she spoke to both parents before and after the last court hearing in November 2017, to reiterate that they needed to engage in domestic violence classes, which neither of them did.

**2. Substance Abuse**

**{¶25}** Regarding substance abuse, Norris stated that mother completed a substance abuse assessment in October 2016, at Behavioral Solutions in Medina. But Norris had " few concerns with Behavioral Solutions" because she was not able to provide the counselor with "collateral" information about mother's case before the assessment. Further, Norris did not receive a urine screen from Behavioral Solutions after they completed the assessment, nor did she ever receive a copy of the actual assessment. Norris also confirmed that Behavioral Solutions did not exist at the time of the permanent custody hearing.

**{¶26}** Because mother did not fulfill her case plan obligations with respect to substance abuse, Norris referred mother to Choices again because the counselor would go to mother's home.   But mother did not avail herself of the services offered by Choices.

**{¶27}** Norris testified that she asked mother to "complete a hair sample" as recently as January 2018, but mother never did.   Although she could not recall how many times she had asked mother to do urine screens, she said that she did ask her more at the beginning of the case plan.   Mother never completed a urine screen throughout the case plan.   The "ongoing concern" was that mother "did admit to using marijuana two to three times per week in July of 2017, and she still won't engage in treatment services."

**{¶28}** Norris testified that when the case began, mother lived in Cuyahoga County. Mother later moved out of the county, to Lake and Medina counties.   Norris stated that CCDCFS does not contract with out-of-county providers, so Norris could only refer mother to providers within Cuyahoga County.   Norris further stated that although transportation was an issue with mother, mother "would always find a ride" to her weekly visits with the children.

### 3. Parenting

**{¶29}** With respect to parenting issues, Norris testified that mother did not visit the children from June to October 2016.   In August 2016, mother told Norris that she "just didn't believe that the allegations were true, and she felt it wasn't necessary to engage in any services." Since October 2016, however, mother had been consistently visiting the children.

**{¶30}** Norris explained that after mother completed supportive visitation services, she referred mother to "nurturing parenting" classes.   Norris received a report that the counselor "wasn't able to engage" with mother regarding these classes.

**{¶31}** Norris testified that she supervises mother's visits with the children. Her main concerns are mother's ability to manage the children's behavior, her negative emotions during visits, and "her explosive behaviors during the visits." Norris explained that rather than redirect the children when they start fighting, mother teases them. And when the children's behavior gets worse — for example when they "bite each other" — mother gets "upset" and exhibits "explosive behavior where she would have a hard time controlling herself in front of the children." Norris stated that by "explosive behavior" she meant that mother "would start to yell. She would get upset. She wouldn't be able to calm herself down, and in front of the children[.]" Norris had to direct mother to use time-outs rather than yell at the children. Norris explained that at one visit, security had to intervene "with the kids due to mom not being able to control her behavior." The last time that security had to intervene was in September or October of 2017. Norris further recalled "one time last year where mom was kicked out of a community setting due to her behavior as well."

**{¶32}** Norris stated that the last time that mother was "negative" during a visit was in January 2018. Norris stated that mother would "express negative emotions * * * toward the foster mom," and she "wouldn't be able to redirect to the visitation with her time with the kids." Norris said that mother has "some issues with foster mom" and "will bring it up constantly during the visit."

### 4. Housing

**{¶33}** Norris explained that mother had unstable housing since the beginning of the case. She stated that mother had lived in four different places since 2016, and none of them was in her own name. At one point, mother was living with her brother but he did not want her to live there anymore "due to her behavior." For about "the last half a year," however, mother had been

living in her current home. But Norris explained that mother's current home was now in foreclosure. Norris explained that she was only able to visit and evaluate mother's home on one occasion, and that was when mother was living in Medina. Norris testified that regarding mother's most recent place, which was in Eastlake, mother told Norris that she did not want Norris to see it because "she didn't have enough furniture or the house wasn't ready."

{¶34} Mother recently asked Norris for assistance with housing, so Norris referred mother to Murtis Taylor for assistance with housing. Norris also referred mother to Lakewood Collaborative and West Side Community House, but mother never followed through with any of these places. Norris further looked into "fast track" housing with CMHA, but that was not an option because CMHA requires the case plan goal to be reunification.

### 5. Employment

{¶35} Norris stated that mother's employment throughout the case had "been pretty unstable." Mother reported to Norris that she had been working at Save-A-Lot since "the end of 2017," but Norris said that mother had never provided verification of this employment.

### 6. Paternal Grandmother

{¶36} The children lived with paternal grandmother from March 2016, when they were removed from mother's custody on an emergency ex parte basis, to September 2016, when paternal grandmother was evicted from her home. Paternal grandmother testified that she had a bachelor's degree from Myers University and an associate's degree from Tri-C community college. She had worked at Humana Care as a nursing assistant for four years.

{¶37} Norris testified that when the children were placed with paternal grandmother, Norris had referred the children for mental health assessments, but paternal grandmother never

followed through with the referral. Norris also referred paternal grandmother for a budgeting class, but she never followed through with that either.

{¶38} Norris testified that one of her main concerns with paternal grandmother was her history with unstable housing. Norris explained that when paternal grandmother was evicted in September 2016, she called Norris on the day of the eviction to tell her that she could not keep the children. After mother and father filed for paternal grandmother to get legal custody (on the day of trial, which was only continued because the GAL had not filed his report at least seven days before trial), Norris did visit paternal grandmother's current home. With respect to grandmother's current home, Norris testified:

> I learned about her situation, she has stable housing, but she expressed to me that the house is under her boyfriend's name, and she couldn't provide a copy of the lease for me, which is a concern because if an issue would arise between the two of them, she may not have stable housing again. Another concern I had is she said she only has been at that place for six or seven months, and the one prior to that for four, so that's not very stable as well over the past year.

{¶39} Paternal grandmother testified that her boyfriend owns the home where she currently lived, and that she paid him $350 in rent a month. Paternal grandmother said that she has an "actual lease agreement" with her boyfriend, but admitted that when Norris came to see the home, she was not "able to show" Norris the lease.

{¶40} Paternal grandmother agreed that when she told Norris that she was being evicted in September 2016, she told Norris that it would be better for her to go back to school to "further [her] education so that [she] could get a better position making more money." According to paternal grandmother, she and Norris "agreed that [paternal grandmother] could get the kids once the program was complete."

{¶41} Norris also expressed concern about paternal grandmother's ability to maintain her housing due to budgeting concerns. Norris explained that in May 2016, the agency and Lakewood Collaborative collectively paid paternal grandmother's rent. After the agency provided daycare for the children in July 2016, paternal grandmother still had problems with paying her rent and was ultimately evicted that September.

{¶42} Norris's other "main concern" with paternal grandmother was the fact that she did not maintain a relationship with the children since she gave them up in 2016. Norris said that paternal grandmother reached out to her in 2016, but "hasn't really tried since then." Paternal grandmother visited the children once in 2017, and then a couple of times in 2018 just before the permanent custody hearing.

{¶43} According to paternal grandmother, after the children were no longer in her care, she said that she tried to call Norris but that Norris never returned her calls. Paternal grandmother agreed, however, that she had not tried to call Norris since 2016. Paternal grandmother said that mother kept her informed about the children. Paternal grandmother stated that she did not visit the children because she thought that mother was going to get the children back. Paternal grandmother also said that she did not visit the children because she worked a lot of hours.

{¶44} Norris testified that since paternal grandmother returned the children to the agency in September 2016, paternal grandmother never expressed anything to Norris about wanting the children back. Norris stated that CCDCFS decided to move for permanent custody at a staffing meeting in September 2016, when paternal grandmother said that she could not keep the children. Paternal grandmother was at that meeting so she knew the agency was going to request permanent custody. Although Norris said that they told paternal grandmother at that

meeting that "if she had stable housing in the future, [they] could possibly reconsider her for legal custody, paternal grandmother never told Norris that she wanted the children back. Paternal grandmother admitted that she did not say anything to Norris about possibly getting the children back when she saw Norris at her one visit with the children in 2017 or at her two visits with the children in 2018 when Norris was supervising the visits.

**{¶45}** Norris agreed that at hearings on the agency's permanent custody motion on May 1, June 28, September 11, and September 27, 2017, neither parent nor his or her counsel stated that paternal grandmother wanted legal custody of the children.

### 7. Father, Foster Home, and Other Relatives

**{¶46}** According to Norris, father did not visit the children from April 2016 until April 2017. She said that he did start visiting again in September through October 2017, but he became inconsistent again after that so she terminated his visitation. Father did not complete any of his case plan requirements.

**{¶47}** Norris testified that the children had been in the same foster home since September 2016, when they were removed from the paternal grandmother's home. Norris visits the children monthly in their foster home and sees them weekly at mother's visitation. Norris testified that the children were doing well. She said the home was appropriate and "foster mom has been engaging in services with them." The children were also working with a behavioral specialist.

**{¶48}** Norris stated that she investigated other relatives, including mother's sister and cousin. According to Norris, the cousin was not appropriate to take custody of the children and mother's sister removed herself from the process.

### D. GAL

**{¶49}** In his report filed before the permanent custody hearing, the GAL recommended that the children be placed in the permanent custody of CCDCFS. The GAL reported that "since removal, mother has failed to complete domestic violence counseling, parenting, and substance abuse counseling." The GAL noted that mother was arrested at juvenile court on September 28, 2017, for disorderly conduct. She had a warrant out for her arrest for not attending a court hearing in that case.

**{¶50}** The GAL stated that at the time he visited mother's home, which was October 23, 2017, "it was in the process of being foreclosed on." Mother did complete a psychological evaluation "and it is reported by mother that she is currently employed."

**{¶51}** The GAL further reported that at his last home visit with father, which was on October 19, 2017, father had stable housing and employment.

**{¶52}** The remaining facts in the GAL's report included the following information that the social worker told the GAL: (1) mother failed to submit drug screens, (2) mother failed to do a hair test and a urine test on January 1, 2018, (3) mother does not have stable housing, but does visit the children weekly, (4) mother is frequently agitated at visits and has gotten belligerent with the social worker and staff at visits, (5) security has to be called during mother's visits when mother is not able to calm down, and (6) father failed to do domestic violence classes, parenting classes, substance abuse counseling, and a mental health evaluation.

**{¶53}** The GAL concluded that the children had been in the custody of CCDCFS for almost two years. Because of lack of progress on the case plan and the children's need for a permanent placement, the GAL recommended permanent custody be given to CCDCFS. After hearing all of the testimony, the GAL testified that he was not changing his recommendation that the court award permanent custody to the agency.

### III. The Trial Court's Judgment

**{¶54}** The trial court found that the children had been in the temporary custody of CCDCFS for 12 or more months of a consecutive 22-month period. It further found that (1) the parents had abandoned the children "for short periods of time," (2) it would be contrary to the children's best interest to return to the mother's home, (3) the parents had continually and repeatedly failed to substantially remedy the conditions that caused the child[ren] to be placed outside the home, (4) the parents demonstrated lack of commitment toward the children by failing to regularly support, visit, or communicate with the children, (5) the parents were unwilling to provide basic necessities for the children, and (6) father committed abuse against one of the children.

**{¶55}** The trial court also noted that the children were placed with paternal grandmother but that the placement was disrupted due to her inability to financially support the children. Since that disruption, paternal grandmother "demonstrated lack of commitment" toward the children by failing to regularly support, visit, or communicate with the children without reasonable cause. The court denied the parents' motion for legal custody to the paternal grandmother.

**{¶56}** The court found that the children had been in the agency's custody for two years and no longer qualified for temporary custody.

**{¶57}** After considering all of the evidence, the court found by clear and convincing evidence that permanent custody was in the best interest of the children and that the children could not be placed with either of their parents within a reasonable time or should not be placed with their parents. The court also found that CCDCFS made reasonable efforts to finalize the

permanency plan for the children, which was reunification with the parents. The court granted CCDCFS permanent custody of the children. It is from this judgment that mother now appeals.

## IV. Standard of Review

{¶58} An appellate court will not reverse a juvenile court's decision awarding permanent custody to an agency if the judgment is supported by clear and convincing evidence. *In re J.M.-R.*, 8th Dist. Cuyahoga No. 98902, 2013-Ohio-1560, ¶ 28. "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954). A reviewing court is required to examine the record to determine whether the trier of fact had sufficient evidence to satisfy the clear and convincing standard. *In re T.S.*, 8th Dist. Cuyahoga No. 92816, 2009-Ohio-5496, ¶ 24.

## V. Permanent Custody Determination

{¶59} The termination of parental rights is governed by R.C. 2151.414. *In re M.H.*, 8th Dist. Cuyahoga No. 80620, 2002-Ohio-2968, ¶ 22. R.C. 2151.414 sets forth a two-part test courts must apply when deciding whether to award permanent custody to a public services agency. First, a court must find by clear and convincing evidence one of the following factors:

> (a) * * * [T]he child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents;
>
> (b) The child is abandoned;
>
> (c) The child is orphaned and no relatives are able to take permanent custody of the child;
>
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * * ; or

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1)(a)-(e).

**{¶60}** Second, a court must find, also by clear and convincing evidence, that granting permanent custody of the child to the agency is in the best interest of the child under R.C. 2151.414(D)(1). These factors include:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child * * *;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) apply in relation to the parents and child.

## VI.  Analysis

**{¶61}** Mother does not challenge the first prong of the permanent custody determination; that is, mother does not challenge the trial court's determination under R.C. 2151.414(B)(1). Instead, mother argues that the agency did not prove by clear and convincing evidence that it was in the children's best interest to be placed in the permanent custody of CCDCFS. She maintains that it was not in the children's best interest because (1) paternal grandmother was available and

willing to take legal custody of the children, and (2) she (mother) was "ready, willing, and able to provide a legally secure permanent placement."

### A. Paternal Grandmother

**{¶62}** Mother argues that it was not in the children's best interest to be placed in the permanent custody of the agency because paternal grandmother could take legal custody of them.

**{¶63}** First, the trial court was not required to consider placing children with a relative prior to granting permanent custody to CCDCFS. The willingness of a relative to care for a child does not alter what the court must consider in determining permanent custody. *In re L.W.*, 8th Dist. Cuyahoga No. 104881, 2017-Ohio-657, ¶ 38-39; *see also In re Patterson*, 134 Ohio App.3d 119, 129, 730 N.E.2d 439 (9th Dist.1999) (concluded that a juvenile court is not required to find by clear and convincing evidence that a grandparent is an unsuitable placement option).

**{¶64}** Further, regarding mother's arguments about paternal grandmother, we note that although mother and father jointly moved for paternal grandmother to obtain legal custody of the children, paternal grandmother is not a party to this appeal. "'[A] parent has no standing to assert that the court abused its discretion by failing to give the [paternal grandmother] legal custody; rather, the challenge is limited to whether the court's decision to terminate parental rights was proper.'" *In re L.W.* at ¶ 23, quoting *In re S.G.*, 3d Dist. Defiance No. 4-16-13, 2016-Ohio-8403. Thus, mother's challenge to the trial court's judgment granting CCDCFS permanent custody in this case is limited to whether the trial court improperly terminated her parental rights.

### B. Mother

**{¶65}** At the outset, we note that the children were too young to consider their wishes and, thus, R.C. 2151.414(D)(1)(b) does not apply. We further note that R.C. 2151.414(D)(1)(e) does not apply because there are no factors under R.C. 2151.414(E)(7) to (11) at issue in this case. Thus, when considering whether there was clear and convincing evidence to support the trial court's finding that it was in the children's best interest to award permanent custody to the agency, we are left with considering the remaining three factors under R.C. 2151.414(D)(1)(a), (c), and (d).

### 1. Interaction and Interrelationship

**{¶66}** Under R.C. 2151.414(D)(1)(a), the trial court was required to consider "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child." There was testimony from the supportive visitation coach, the GAL, and the social worker that mother and the children were bonded. Father, however, rarely visited the children. And although the children lived with paternal grandmother when they were born because their parents lived with paternal grandmother at that time and for a six-month period during the pendency of this case, there was no testimony that the children and paternal grandmother were bonded. Indeed, from the time paternal grandmother told the agency that she could no longer care for the children, in September 2016, until the time of the permanent custody hearing, paternal grandmother had only visited them three times; once in 2017 and twice in 2018. Moreover, paternal grandmother testified that when she visited the children, she was not even sure if they remembered her. The social worker further testified that the children had been in the same foster home since September 2016, and stated that they had adjusted well and that their needs were being met.

**2. The Custodial History of the Child**

{¶67} R.C. 2151.414(D)(1)(c) provides that a best-interest factor in a permanent custody case is "[t]he custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period." Here, the children had been in the agency's custody for nearly two years (at the time of the hearing, it had been one year and 11 months).

**3. Legally Secure Permanent Placement**

{¶68} R.C. 2151.414(D)(1)(d) provides that a best-interest factor in a permanent custody case is "[t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency."

{¶69} The children were removed from the parents in March 2016. Neither parent visited the children from June to October 2016, nor had they engaged in any services offered by the agency. As a result, the agency moved for permanent custody in November 2016. Since that time, mother had over one year to complete the objectives of her case plan, and she failed to do so.

{¶70} Mother argues that Dr. Baenen, the psychologist, testified that mother "reported difficulty meeting the expectations of the agency which included attending six classes while working and trying to obtain her GED, particularly because she was residing outside of Cuyahoga County." It is not clear what mother is trying to argue here, but Dr. Baenen also opined that despite having over a year and a half to do so, mother had not meaningfully addressed her case plan. Dr. Baenen found that although mother's failure to address her case plan had nothing to do with any mental illness, it raised concerns about mother's "capacity for organized and

effective functioning" and "mother's commitment to her children." Indeed, Dr. Baenen, who had been conducting custody evaluations for the juvenile court for over 25 years, had "serious concerns" over mother's ability to "effectively organize parenting of two children on her own."

**{¶71}** We also question mother's claims that her transportation issues prevented her from engaging in the required services. First, Norris testified that she referred mother to Choices for several aspects of her case plan. Norris stated that she specifically referred mother to Choices because the counselors would go to mother, and mother would not have to find transportation. But a counselor at Choices told the social worker that mother informed the counselor that "she wasn't interested in services."

**{¶72}** Mother further claims that the evidence showed that the agency failed to refer her to counseling when Dr. Baenen recommended that counseling would be good for mother due to the trauma she experienced in her childhood. Norris testified, however, that the counselors at Choices would have provided personal counseling for mother had she engaged in its services.

**{¶73}** Mother also argues that she satisfied the substance abuse requirement of her case plan because she completed an assessment at Behavioral Solutions in Medina and there were no recommendations. But as Norris testified, she was never able to discuss mother's case with someone at Behavioral Solutions to ensure that they assessed mother properly. Further, Norris never received a urine screen from Behavorial Solutions or a copy of the actual assessment. Morever, mother admitted to Dr. Baenen in July 2017, that she smoked marijuana two to three times per week. Mother admitted this despite knowing that she was not supposed to do so under her case plan. Mother also never obtained a drug screen during the pendency of her case plan.

**{¶74}** Mother further claims that the only reason she failed to attend domestic violence classes was because of her transportation issues. But as we previously stated, Norris specifically

referred mother to Choices because the counselor would have gone to mother's home. Thus, mother cannot use transportation as an excuse for failing to engage in domestic violence classes for nearly two years. Domestic violence was the reason the children were removed from mother's custody in the first place after father punched mother in the face while she was holding Ra.E. And although there had not been another domestic violence incident since the children were removed, there was a history of domestic violence between the parents.

{¶75} Mother also maintains that she had been living in the same place for six months at the time of trial. While that may be true, Norris also stated that she learned that mother's home was in foreclosure.

{¶76} Mother also argues that Steponick, the supportive visitation coach, reported that mother was "engaged" and did "all of the things" that was expected of her. Mother is misconstruing Steponick's testimony. Steponick actually testified that her responsibility was to ensure that mother was engaged and did all of the things that were expected of her. While Steponick did say that mother listened to her recommendations and benefitted from the supportive visitation, these classes ended in February 2017. Norris continued to monitor mother's visitation for the next year. Norris explained that mother continued to have issues with parenting the children and had frustrations when they would not behave.

{¶77} Finally, mother contends that the "the law does not require perfection of parents with regard to completion" of their case plan. Even if we were to find that mother substantially complied with her case plan (which we are not doing), even the successful completion of a case plan, "'is not dispositive on the issue of reunification.'" *In re W.A.J.*, 8th Dist. Cuyahoga No. 99813, 2014-Ohio-604, ¶ 19, quoting *In re C.C.*, 187 Ohio App.3d 365, 2010-Ohio-780, 932 N.E.2d 360 (8th Dist.). "A parent can successfully complete the terms of a case plan yet not

substantially remedy the conditions that caused the children to be removed — the case plan is simply a means to a goal, but not the goal itself." *Id.* In this case, however, mother did not successfully complete — or even substantially complete — her case plan. Further, mother never even attempted to remedy the conditions that caused the children to be removed from her custody.

**{¶78}** Indeed, Norris explained that the permanent custody motion had been filed in November 2016. Norris said that at hearings on the agency's motion — on May 1, June 28, September 11, and September 27, 2017 — she laid out the objectives of the case plan to the parents, and neither one expressed concerns that they could not meet them.

**{¶79}** After review, we find that clear and convincing evidence contained in the record supports the trial court's finding in this case that it was in the children's best interest to be placed in the permanent custody of the agency. The children had spent over half of their lives outside of mother's care. For a portion of that time, mother did not visit the children at all. Although she had consistently visited them since October 2016, she did not complete all of the aspects of her case plan despite having nearly two years to do so. "Ohio courts uniformly hold that '[n]on-compliance with a case plan is grounds for termination of parental rights.'" *In re A.B.*, 6th Dist. Lucas Nos. L-12-1069 and L-12-1081, 2012-Ohio-4362, ¶ 19, quoting *In re Campbell*, 138 Ohio App.3d 786, 742 N.E.2d 663 (10th Dist.2000).

**{¶80}** Accordingly, we overrule mother's sole assignment of error.

**{¶81}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

MARY J. BOYLE, JUDGE

MELODY J. STEWART, P.J., CONCURS;
LARRY A. JONES, SR., J., DISSENTS WITH SEPARATE OPINION

LARRY A. JONES, SR., J., DISSENTING:

**{¶82}** Respectfully, I dissent. I am well aware that a parent has no standing to assert that a juvenile court abused its discretion by failing to give a relative legal custody because the parent's challenge is limited to whether the court's decision to terminate parental rights was proper. *In re L.W.*, 8th Dist. Cuyahoga No. 104881, 2017-Ohio-657 at ¶ 23. I am further cognizant that this court has stated that if permanent custody to the agency is in a child's best interests, legal custody to a relative necessarily is not. *In re V.C.*, 8th Dist. Cuyahoga Nos. 102903, 103061, and 103367, 2015-Ohio-4991, ¶ 60, citing *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 11. This court has cited the aforementioned cases, and others, to explain why juvenile courts have no obligation to determine a relative's suitability in permanent custody decisions. While I do not disagree with our precedent, a broader concern is that these concepts are not employed to categorically reject suitable kinship custody.

**{¶83}** Thus, although mother's challenge to the trial court's judgment granting CCDCFS permanent custody is limited to whether the trial court improperly terminated her parental rights, in this case, it is difficult to determine that without considering placement with paternal

grandmother. As the majority outlines, the juvenile court must find by clear and convincing evidence that granting permanent custody is in the children's best interest under R.C. 2151.414(D)(1). The court in this case could not determine what was in the children's best interest without considering placement with paternal grandmother because the court, pursuant to R.C. 2151.414(D)(1), had to consider *all* relevant factors, including, but not limited to: "(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency."

{¶84} I would find that the trial court abused its discretion in granting permanent custody to the agency because it was not in the children's best interest. Under R.C. 2151.414(D)(1), the children's need for a legally secure placement could be achieved through legal custody to the paternal grandmother.

{¶85} Contrary to the agency's position that the paternal grandmother did not have stable housing because her name was not on the lease of her boyfriend's home, grandmother testified that her boyfriend owned their four-bedroom furnished home and would assist with the children. The children had previously been placed with the paternal grandmother and, although that placement had been interrupted, I would not fault grandmother for deciding to continue her education in the hopes she could find a better paying job; grandmother testified it was her understanding she could get the children back once she completed her educational program. Grandmother also testified that, at the time she gave up custody of the children, she was being evicted and could not afford to pay her bills based on her current income, even though she had maintained steady employment for the past four years. Grandmother maintained that she had already cut back on her hours at work to care for the children and the agency, despite its

promises, failed to assist her in securing appropriate child care so she could both work and care for the children.

{¶86} Grandmother further testified that after the children were removed from her care, she called the social worker and the social worker's supervisor numerous times to inquire as to the children but never received return phone calls. Grandmother testified that the agency told her she had "no rights" because she was not the children's guardian: "I called Child Services myself, and that's what I was told. No one ever called me back. I even called with complaints and no one ever called me back."

{¶87} In addition, according to grandmother, she did not know "we were in jeopardy of completely losing the kids. Had I known that, I would have done everything in my power to get the kids back sooner." Grandmother testified that her understanding was that mother would regain custody and that was "my focus the entire time." Grandmother maintained that the agency would not talk to her or update her on the status of the children and that any information came from the children's mother, with whom grandmother had a tenuous relationship.

{¶88} The record shows that while the agency should have explored strengthening the kinship ties between paternal grandmother and the children so that the children could be placed with the grandmother if they could not be returned to their parents, the agency instead seemingly gave up on the grandmother once the children were placed in foster care. In fact, grandmother testified that when she visited with the children after they were placed in foster care, she was never approached about taking legal custody of the children.

{¶89} The social worker testified:

Q: Okay. Now, at that staffing that occurred in September of 2016 when the boys came out of [paternal grandmother's] care, what was decided at that point in time?

A: It was decided for permanent custody, but to look if she had stable housing in the future, we could possibly reconsider her for legal custody.

{¶90} The social worker, however, admitted that she never reached out to paternal grandmother about placement, even to ask her if there were other relatives the social worker could investigate. According to the social worker, she did not reach out to grandmother "because I didn't know that paternal grandmother was interested or if there were any other options for paternal relatives." The social worker blamed this on the parents' lack of communication with her. So rather than investigate grandmother to see if she was an appropriate caregiver, the agency chose to just pursue permanent custody and sever all familial bonds.

{¶91} The transcript evidences a complex situation in which the children are unable to be returned to their parents and have been in foster care during critical formative years. While they no doubt are in need of a legally secure placement, that placement can and should be achieved without a grant of permanent custody to the agency.

{¶92} For these reasons, I dissent and would reverse and remand the case to the trial court.